*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0230p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ERIC JONES,

        *Plaintiff-Appellant,*

    *v.*

JOHN E. POTTER, Postmaster General,

        *Defendant-Appellee.*

No. 06-3845

>

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 05-00163—Christopher A. Boyko, District Judge.

Argued: April 27, 2007

Decided and Filed: June 20, 2007

Before: GUY, BATCHELDER, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** John L. Wolfe, Akron, Ohio, for Appellant. Ray E. Donahue, UNITED STATES POSTAL SERVICE, Washington, D.C., for Appellee. **ON BRIEF:** John L. Wolfe, Akron, Ohio, for Appellant. Ray E. Donahue, UNITED STATES POSTAL SERVICE, Washington, D.C., for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Following a verbal, on-the-job altercation with a female coworker in March of 2002, Eric Jones was discharged from his post as a torn-mail handler with the United States Postal Service (USPS). An arbitrator subsequently determined that Jones's dismissal was disproportionately harsh, which resulted in the USPS returning him to active duty in July of 2003. His reinstatement included backpay for all but 30 days of wages and benefits lost during the period of his unemployment. Despite having thus been "made whole," Jones filed the instant suit in federal district court seeking compensatory damages for having allegedly suffered emotional distress as a result of his earlier firing. He also sought attorney fees and costs. As grounds for the suit, Jones alleged that his termination had been based on improper motives relating to his race, gender, physical disabilities, and prior litigious activity against the USPS.

The district court granted summary judgment to the USPS, holding that Jones was unable to meet his burden of demonstrating that the USPS's articulated reason for his termination—namely,

its zero-tolerance policy regarding violence in the workplace—was a pretext designed to mask discrimination.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

**A.        Factual background**

Jones's employment with the USPS began in 1988, when he was hired as a mail handler. His employment has been marked by numerous on-the-job as well as off-the-job injuries followed by a corresponding number of workers' compensation claims and changes in job status.  In total, he has filed four claims, three of which have been allowed, and he has changed job title or status (i.e., full or limited duty) no fewer than five times.

In 1993, Jones injured his cervical and thoracic spine while dumping bags of mail as part of his mail-handling duties.  He filed, and was allowed, a workers' compensation claim for subluxation of the spine.  At some point thereafter, the USPS assigned Jones to the limited-duty position of torn-mail handler.  This job required minimal lifting and allowed Jones to sit for eight hours a day.

In 1997, he suffered new injuries as a result of a car accident, but was denied additional compensation because those injuries were unrelated to his 1993 on-the-job accident.  Jones returned to full-time status as a mail handler in late 1998.  But he reaggravated his preexisting injuries a little more than a year later while at work and was again placed on limited-duty status as a torn-mail handler.  He was assigned to a different limited-duty position in early 2001, this time preparing "flats" of unbundled magazines.  Less than a month into his new job assignment, Jones injured his wrist.  He filed another workers' compensation claim, which resulted in his being once again returned to the torn-mail handler position.

USPS policy required Jones to support his claims and reassignments with medical documentation on an ongoing basis.  For the most part, Jones complied.  But on two separate occasions near the end of 2001, a workers' compensation specialist in the Akron office questioned why Jones remained in the torn-mail-handler position, which was considered internally as having a "lost production" status.  Felton Miller, Jones's supervisor, was promptly notified that Jones had failed to properly document his claim of continuing problems in his neck, shoulder, and back. Miller subsequently ordered Jones "off the clock" for "want of medical documentation" at the end of January of 2002.  Soon thereafter, Jones filed a complaint with the EEOC.  He was returned to his post as a torn-mail handler a month later after his claim was resolved with the help of an EEO dispute-resolution specialist.

The issues in the present appeal revolve around the events of March 13, 2002.  That morning, unlike almost every other morning that had preceded it for the previous 12 years, Cynthia Ortiz did not give Jones a ride to work.  The two had been intimately involved from 1991 through 1999, but even after their relationship "officially" ended, Ortiz continued to give Jones a ride to and from work.  They both worked for the same "tour" at the USPS Akron facility, and both were mail handlers. Jones took exception to Ortiz's standing him up, and he confronted her once he eventually made his way in to work on the morning in question.

The parties strongly dispute what actually took place during this exchange, but for the purpose of this appeal from the grant of summary judgment, we must accept Jones's version of the events.  In his testimony before the EEOC administrative law judge (ALJ), Jones recalled the confrontation with Ortiz as follows:

> I parked in the dock.  I come in the building like I usually come in with Cynthia.
> And I said, "Thank you."
> And she said, "Thank you for what?"

> I said, "All I asked you was for a ride and if you couldn't, to let me know."
> And she was putting a package in an APC [adjustable parcel container].
> I was talking to her in her ear. I was close.
> And she turned around and it knocked the coffee out of my hand.
> And I said, "That's why we can't make it, is because you be acting so crazy."
> She turned and put her hand in my face like, "Talk to the hand."
> I moved her hand out of my face.
> And she said, "Leave my work area", twice.
> Once she said it. And she said it loud.
> I turned around and I walked away.
> I went to my work area.

Ortiz's version of the confrontation indicates a much greater degree of misconduct by Jones, including cursing and pushing. But even Jones's version concedes both that he initiated the confrontation with Ortiz ("I said, 'Thank you.'") and that he touched her at least once ("I moved her hand") during the approximately two minutes that it lasted.

Upon learning of the incident from an eyewitness and after talking personally with Ortiz, Supervisor Miller sent both Jones and Ortiz home for the day. Jones and Ortiz subsequently gave several statements recounting their respective versions of the events. Less than a week later, Ortiz was placed on administrative leave with pay, but was not removed from duty. Jones, however, was assigned to emergency placement without pay until further notice on the ground that he was "injurious to others." In May of 2002, Jones received a "notice of removal" for having violated the USPS's zero-tolerance policy regarding violence in the workplace.

The USPS has a longstanding written policy that prohibits any and all forms of workplace violence. This "zero-tolerance policy" provides in pertinent part as follows:

> [E]ach and every act or threat of violence from this day forward, regardless of the people involved and/or circumstances, will elicit a prompt investigation of facts and an appropriate response. While certain behaviors can lead to discipline or removal, our emphasis is on providing a safe and healthful workplace environment for each and every employee.

> This zero tolerance policy places all employees on notice that threats, assaults, or other acts of violence committed against other postal employees or customers will result in severe disciplinary action.

## B.　　Procedural background

Jones filed several claims challenging his May 2002 termination as discriminatory. He first filed a grievance through the process set forth in the collective bargaining agreement between the USPS and the National Postal Mail Handlers Union. This claim resulted in an arbitration award in Jones's favor that was issued in June of 2003. The arbitrator determined, in essence, that Jones's punishment did not fit his "crime." There was little doubt that Jones's actions, as an initial matter, fell within the scope of the USPS's zero-tolerance policy. As the arbitrator explained:

> Despite his denials of having "cursed" the involved co-worker, called her a "bitch" or, even, to have forced her arm from his face and/or pushed her against a mail container, his admissions of having entered her work area in a "confrontational" posture, having "scolded" her and having "touched" her, in doing so, had been sufficient "misconduct" for discipline purposes.

But these actions did not, in the arbitrator's opinion, justify the severity of the discipline that the USPS ultimately imposed on Jones. Instead, "the evidence persuades that the behavior of the grievant had supported no more than a suspension penalty" of 30 days, which had long since elapsed. The arbitrator accordingly ordered the USPS to reinstate Jones and make him "whole" by awarding him lost wages and benefits for the period of his unemployment, less 30 days. In July of 2003, the USPS complied with the order and returned Jones to active status.

Jones's pending EEOC claim, which he had filed at the same time as his grievance, was ultimately resolved against him more than a year later. In that claim, he had alleged that his termination was the result of the USPS's discriminatory and retaliatory motives. Following a hearing in November of 2004, however, the ALJ determined that the USPS's zero-tolerance policy on violence in the workplace constituted a legitimate, nondiscriminatory reason for its decision to fire Jones. The ALJ further found that there was no evidence to indicate that Jones's race, gender, disability, and/or prior litigious activity factored into the USPS's decision.

Having properly exhausted his administrative remedies, Jones filed suit in federal court. He again alleged discrimination on the basis of disability, race, and gender, as well as a retaliatory motivation. But as the district court noted, Jones "abandoned the race claim and minimized the gender and retaliation claims" after the USPS moved for summary judgment. His focus remained instead on his disability claim. Accordingly, he argued that the rationale articulated by the USPS for his termination—namely, its zero-tolerance policy regarding violence in the workplace—was pretextual.

The district court disagreed, concluding that the evidence presented by Jones was not sufficient to meet his burden of showing pretext. Specifically, the court determined that the two affidavits that Jones submitted from former coworkers Kenneth Johnson and Geraldine Smith were, respectively, "nonsensical to the average juror" and "an isolated, after-the-fact remark which carries little weight towards proving a discriminatory animus." The court further noted that, because both affidavits "require[] the fact-finder to apply inferences to ascertain its meaning, [they are] not direct, competent evidence." Jones presented no other evidence to demonstrate pretext, and the district court had already rejected his late-filed motion for a continuance that he claimed was necessary to allow him time to locate and add a potentially favorable witness. Accordingly, the court granted summary judgment to the USPS as to all of Jones's claims. This timely appeal followed.

## II. ANALYSIS

### A.      Standard of review for a grant of summary judgment

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.      Standard of review for a claim of discrimination

As a preliminary matter, Jones argues that the "district court erred in deferring to the decision of the EEOC administrative law judge, thereby denying Jones a trial *de novo* in a district court." To be sure, the district court did note at the end of its opinion that, although "it is not bound" to do so, "this Court will grant due deference to these independent adjudicators [the arbitrator and the ALJ],

who, after hearing live testimony and assessing credibility of witnesses, found that the United States Postal Service had a legal, rational basis for imposing discipline upon Eric Jones." We need not rule on the merits of Jones's argument, however, because we must engage in the de novo inquiry that Jones complains the district court failed to conduct. He is therefore assured of receiving the review that he alleges his claim is due. Furthermore, Jones's insistence that he was specifically "entitled to a trial *de novo* before a jury" is misplaced because summary judgment, Rule 12(b)(6) dismissals, and all other accepted forms of pretrial disposition are specifically designed to weed out claims that lack merit as a matter of law.

The Rehabilitation Act, not the Americans with Disabilities Act (ADA), constitutes the exclusive remedy for a federal employee alleging disability-based discrimination. *See* 42 U.S.C. § 12111(5)(B)(i) (defining employers covered by the ADA, but excluding the United States or a corporation wholly owned by the U.S. government); *Peltier v. United States*, 388 F.3d 984, 989 (6th Cir. 2004) ("[T]he Rehabilitation Act . . . provides the remedy for federal employees alleging disability discrimination."). Under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

To recover on a claim of discrimination under either the ADA or the Rehabilitation Act, which in this circuit share the same substantive standard, "a plaintiff must show that: 1) he is an individual with a disability; 2) he is 'otherwise qualified' to perform the job requirements, with or without reasonable accommodation; and 3) he was discharged solely by reason of his handicap." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996); *see also Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 363 n.2 (6th Cir. 2007) (explaining that, unlike "every other circuit save one," the Sixth Circuit continues to subject claims brought under either the ADA or the Rehabilitation Act to the same substantive standard despite the linguistic differences between the two acts).

Because Jones attempts to meet this burden by presenting circumstantial, as opposed to direct, evidence of discrimination, we apply the familiar three-step burden-shifting framework originally articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). The initial burden rests with the plaintiff to establish a prima facie case of discrimination. *Monette*, 90 F.3d at 1186. If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision. *Burdine*, 450 U.S. at 253. Should the employer carry this burden, then the burden returns to the plaintiff to prove by a preponderance of the evidence that the employer's proffered reason was in fact a pretext designed to mask illegal discrimination. *See id.* Jones can defeat summary judgment only if his evidence is sufficient to "create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *See Macy*, 484 F.3d at 364.

## C.    Prima facie case

Although the district court granted summary judgment to the USPS on the issue of pretext (the third step under the *McDonnell Douglas* framework), the USPS urges us to affirm the court's decision instead on the ground that Jones failed to establish a prima facie case of disability-based discrimination under the Rehabilitation Act (the first step). To do so, a plaintiff must establish each of the following five elements: (1) that he is disabled, (2) that he is otherwise qualified for the job, with or without reasonable accommodation, (3) that he suffered an adverse employment action, (4) that his employer knew or had reason to know of his disability, and (5) that, following the adverse employment action, either he was replaced by a nondisabled person or his position remained open. *See Timm v. Wright State Univ.*, 375 F.3d 418, 423 (6th Cir. 2004); *see also Monette*, 90 F.3d

at 1185 (setting forth the same prima facie elements under the ADA). The final element "may also be satisfied by showing that similarly situated non-protected employees were treated more favorably." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).

In the present case, the USPS concedes that Jones was disabled and that he suffered an adverse employment action. But the USPS argues that Jones was not "otherwise qualified" for the position of mail handler, that no similarly situated nonprotected employee was treated more favorably than he, and that his dismissal did not occur "solely" on account of his disability.

As an initial matter, the USPS is correct in pointing out that, under de novo review, "we may affirm on any grounds supported by the record even if different from the reasons of the district court." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002). But its argument rests on an erroneous, and overly strict, understanding of Jones's prima facie burden at the summary judgment stage. His burden is "not onerous," *see Burdine* 450 U.S. at 253, and requires less than a typical preponderance-of-the-evidence showing. As this court recently explained in *Macy*, 484 F.3d at 364 n.4:

> In *Burdine*, the Supreme Court stated that a plaintiff must "prove by a preponderance of the evidence" the elements of a prima facie case in order to meet his burden [under the first *McDonnell Douglas* step]. *Burdine*, 450 U.S. at 253. However, the Court was reviewing a bench trial, not a motion for summary judgment, and we have since made clear that a district court's duty in reviewing a motion for summary judgment is to "determine[ ] if a plaintiff has put forth sufficient evidence for a reasonable jury to find her to have met the prima facie requirements." *Cline [v. Catholic Diocese of Toledo]*, 206 F.3d [651,] 661 [(6th Cir. 2000)]; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509-10 (1993) (stating that a question of fact remains for the jury if "reasonable minds could differ as to whether a preponderance of the evidence establishes the facts of a prima facie case") (emphasis removed).

The district court acknowledged that Jones could not, by his own admission, perform the job of a mail handler, but concluded that "a jury could determine that he was qualified to perform the essential functions of a torn mail handler." But the torn-mail-handler job, the USPS argues, was only a temporary position; the job of mail handler was Jones's "permanent" position, and only permanent positions matter for the purposes of the "otherwise qualified" prong of the prima facie test.

We agree with the USPS that Jones was required to provide medical documentation on a regular basis to support his remaining in the torn-mail-handler position. Absent such documentation, he was to be returned to his initial mail-handler post. But this does not necessarily compel the conclusion that the torn-mail-handler position was not Jones's permanent job at the time that he was fired. He had, after all, been returned to that position two months before the incident with Ortiz after only a brief stay among the regular mail handlers. In fact, since his first on-the-job injuries in 1993, Jones had spent the majority of his time at the Akron facility as a torn-mail handler. At the very least, a jury could reasonably conclude that Jones's job was that of a torn-mail handler and that he was therefore "otherwise qualified" to perform it.

Whether Jones was treated more harshly than similarly situated employees is a closer question. (Jones concedes that he cannot show that he was replaced by a nondisabled person after his firing or that his position remained open, so we address only the alternative formulation of the final prong of the prima facie test.) To be considered "similarly situated, the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or

mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 599 (6th Cir. 2001) (quotation marks omitted).

Jones identified as comparators Ortiz and numerous other USPS employees who had engaged in violence while at work. Regarding Ortiz, the district court concluded that she was not similarly situated to Jones because of his own admission that he had been the instigator of their confrontation. She had not, in other words, "engaged in the same conduct" as he had. Regarding the other USPS employees who had engaged in workplace violence, the district court reiterated the conclusion of the ALJ that they "were, in fact, treated the same as [Jones] in that they were issued discipline, including notices of removal, for improper conduct." But this reasoning necessarily implies that not all of these employees were issued notices of removal. We therefore conclude that, at the very least, "reasonable minds could differ as to whether a preponderance of the evidence establishes that" Jones was treated more harshly than similarly situated employees. *See Macy*, 484 F.3d at 364 n.4 (quoting *Hicks*, 509 U.S. at 509).

Finally, the USPS argues that Jones cannot establish that his dismissal occurred solely by reason of his disability. This argument, however, rests on an erroneous conflation of a plaintiff's prima facie burden with his ultimate burden of prevailing under the Rehabilitation Act. To be sure, this court has stated on at least one occasion that a plaintiff seeking to establish a prima facie case under the Rehabilitation Act must show that the adverse employment decision that he suffered occurred "solely by reason of [his] disability." *Peltier*, 388 F.3d at 989. But this formulation of the standard is inconsistent with this court's seminal disability-discrimination decision in *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173 (6th Cir. 1996), and imposes too great of a burden upon the plaintiff at this early stage of the *McDonnell Douglas* inquiry. That inquiry, after all, applies only when the plaintiff lacks direct evidence of discrimination, as discussed in greater detail in Part II.D. below.

In *Monette*, the court explained that "[p]roof of these five facts [constituting a prima facie case] . . . creates a mandatory inference that the employer intentionally discriminated against the disabled individual . . . 'solely' because of his or her handicap." 90 F.3d at 1185. An inference that the adverse action occurred "solely by reason of" the plaintiff's disability, in short, is *the result* of the prima facie test, not an element of it. If the law were otherwise, the *McDonnell Douglas* framework would serve virtually no purpose in cases brought pursuant to the Rehabilitation Act and other single-motive statutes.

The USPS's argument is accordingly without merit. We agree with the district court that Jones has raised genuine issues of material fact regarding his prima facie case that preclude a ruling in favor of the USPS on this basis.

## D.      Pretext

Because the USPS articulated a legitimate reason for its decision to fire Jones that was unrelated to his disability, the remaining question is whether that reason was simply a pretext designed to mask discrimination. *See Burdine*, 450 U.S. at 253. Demonstrating pretext is the employee's burden. To satisfy his burden, Jones must show by a preponderance of the evidence "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis omitted). This court has typically grouped the first and third tests together because they are both "direct attacks on the credibility of the employer's proffered motivation for firing [the employee] and, if shown, provide an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.'" *Id.* (quoting *Hicks*, 509 U.S. at 511). The second test, by contrast, "is of an entirely different ilk"

because "the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal." *Manzer*, 29 F.3d at 1084 (emphasis in original).

Jones effectively concedes that he cannot prevail under the first test. The USPS's zero-tolerance policy against workplace violence exists in writing, and Jones's conduct toward Ortiz (namely, pushing away her hand) not only occurred by his own admission, but falls well within the policy's scope. *See id.* ("The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are factually false.") (emphasis and quotation marks omitted). Regarding the third test, Jones argues *not* that he can actually demonstrate that the zero-tolerance policy was "insufficient" to motivate his firing, but simply that the district court erred in not allowing him to even attempt to do so. The district court indeed concluded that Jones "has available to him only the second method of showing pretext" because "the zero-tolerance policy was in effect well before" his confrontation with Ortiz and because he was "aware of its terms."

Under this court's caselaw, "[t]he third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.* Whether the district court erred in allegedly "preventing" Jones from making this showing is immaterial, however, because we conclude that Jones would not have been able to do so even if given the opportunity. This showing, in our view, is the flip side of the fifth prong of the prima facie test: Although Jones was able to raise a genuine issue of material fact by showing that at least some similarly situated employees were treated more favorably, the fact that some were also treated identically (by also receiving notices of removal) indicates that his conduct was "sufficient" to motivate his firing.

The second test, then, indeed represents Jones's best opportunity to show pretext. His showing rests exclusively on the affidavits of Johnson and Smith. As noted earlier, the district court accorded little weight to either, finding that Johnson's affidavit would have been "nonsensical to the average juror" and that Smith's affidavit recited nothing more than "an isolated, after-the-fact remark" by Miller, Jones's supervisor. More generally, the court discounted both affidavits on the ground that understanding their true meaning "requires the fact-finder to apply inferences." Neither affidavit, therefore, constituted "direct, competent evidence" in the court's opinion.

We find the district court's analysis problematical. Simply because evidence is not "direct"—in that its meaning cannot be understood without one or more inferential steps—does not render that evidence insufficient to defeat summary judgment. The summary judgment standard stands for the contrary proposition: All inferences must be drawn in the nonmoving party's favor unless they are "unreasonable" or "impermissible." *See Matsushita*, 475 U.S. at 587-88. That is, the standard explicitly contemplates "indirect" evidence and even instructs the court how to treat it.

With these principles in mind, we conduct our own analysis of the affidavits in question. Johnson's affidavit states in pertinent part as follows:

> I asked [Felton Miller, Jones's supervisor], "What happened about Eric [Jones] and Cynthia [Ortiz]. You put my boy out of the building." He said, "It wasn't a hard decision. You've got $250,000.00 in one hand and zero on the other; so it's not a hard decision to make." I said, "What does that mean?"

Johnson also offered the conclusory statement that "[m]anagement at the [Post Office] often looks upon injured workers as if they are trying to 'scam' the Post Office, that their injuries are not serious."

We agree with the district court that Johnson's latter statement is an "opinion, without any foundation in fact," and that it finds no corroboration anywhere in the record. As to the statement about the $250,000 quoted above, Jones's interpretation of it—namely, that Ortiz's likely recovery had she sued the USPS ("in one hand") and Jones's likely recovery ("on the other") created clear economic incentives for the USPS to fire Jones but not Ortiz—at least raises a genuine issue of fact regarding the USPS's true motivations for firing him.

There is, however, a problem with the $250,000 statement that is ultimately fatal to its effect at the summary judgment stage. Simply put, even if economic-based liability considerations, and not simply the zero-tolerance policy, in part motivated the USPS's decision, those considerations bear no relation whatsoever to the forms of discrimination (disability, gender, and race) and retaliation that Jones alleged in his complaint. Jones's burden under the *McDonnell Douglas* framework is to show "pretext for unlawful discrimination," not pretext that masks other, nondiscriminatory motivations. *See Macy*, 484 F.3d at 364 (discussing the plaintiff's burden under the *McDonnell Douglas* framework). In other words, although Supervisor Miller's statement as recounted by Johnson creates an issue of fact, it is not a fact that is "material" to Jones's claims. *See Anderson*, 477 U.S. at 248 (holding that only those factual disputes that might affect the "outcome of the suit under the governing law" are material); Fed. R. Civ. P. 56(c) (commanding the entry of summary judgment where "there is no genuine issue as to any material fact").

Jones also submitted the affidavit of Smith to support his showing of pretext. Smith's affidavit states in pertinent part that

> [s]ometime after Eric Jones had been put out of the building on emergency placement or had been removed, I talked with Felton Miller about Eric Jones, whom I knew. Miller told me that "He couldn't do the job. He wasn't working his job, and this (meaning the Cynthia Ortiz incident) gave him a chance to get rid on [sic] Eric Jones." From this I inferred that the Ortiz incident was more or less "icing on the cake."

We again agree only in part with the district court's analysis of this statement. Miller's alleged comment is, by its own terms, "an isolated, after-the-fact remark," and therefore would normally carry little weight toward proving a discriminatory animus. *See Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 379 (6th Cir. 2002) (finding an "isolated remark" that was "remote in time" to be insufficient to show pretext in an age-discrimination case).

But not all isolated remarks are treated alike. Typically only those that are unrelated to the adverse employment decision at issue are deemed insufficient to support a claim of pretext. *See, e.g.*, *id.* (noting that the employer's ageist comment was not only isolated and remote in time, but also "not related to the decision not to rehire Weigel"). In the present case, however, Miller's alleged comment to Smith, although after the fact, was directly related to Miller's decision to fire Jones. That decision, after all, was the very basis for Smith's speaking with Miller in the first place.

The district court also noted that Miller's statement to Smith "can be read as the employer could not terminate Plaintiff without a legal reason; and now, the violation of the zero-tolerance policy provided a legitimate reason." But that reading of the statement is the very definition of pretext: The employer (Miller) waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee (Jones). The

question thus again becomes whether those true motivations were, in fact, unlawful. If not, then the issue of pretext would be immaterial, making summary judgment appropriate.

Miller's alleged statement to Smith raises two distinct inferences. First, the phrase "[h]e wasn't working his job" rather clearly expresses Miller's belief that Jones was doing subpar work. Poor job performance, of course, is a perfectly legitimate, legal reason for firing an employee. But the immediately preceding phrase "He couldn't do the job" implies the separate belief that Jones was *incapable* of doing his job, thereby evoking his disability. Because both of these inferences are reasonable, the district court concluded that Miller's statement to Smith was not direct evidence of discrimination:

> The Court further finds that the statement to Geraldine Smith by Felton Miller is subject to more than one reasonable interpretation. Since the evidence requires the fact-finder to apply inferences to ascertain its meaning, it is not direct, competent evidence.

Direct evidence of discrimination, however, is not required for a plaintiff to defeat summary judgment. The law is clear: In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587. The inference raised by the phrase "[h]e couldn't do the job"—namely, that Miller had for some time wanted to fire Jones at least partially because of his physical disabilities—was reasonable and therefore should have been drawn in Jones's favor.

We also reiterate that "requir[ing] the fact-finder to apply inferences" is precisely what the summary judgment standard contemplates, and that "direct" evidence is not required by the *McDonnell Douglas* framework for a plaintiff to defeat a motion for summary judgment. In fact, *McDonnell Douglas* comes into play only where a plaintiff lacks direct evidence of discrimination, as is typically the case. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348-49 (6th Cir. 1997) ("The direct evidence and circumstantial evidence paths are mutually exclusive . . . . [I]f a plaintiff attempts to prove its [sic] case using the *McDonnell Douglas-Burdine* paradigm, then the party is not required to introduce direct evidence of discrimination."); *see also Macy*, 484 F.3d at 364 (applying the *McDonnell Douglas* framework only because the plaintiff "attempts to meet [her] burden by presenting circumstantial evidence of discrimination").

But the circumstantial evidence of disability discrimination contained in Smith's affidavit is not sufficient to save Jones from summary judgment. In several other employment-discrimination contexts where a plaintiff can prevail by showing mixed motive—that is, a showing that his employer's discriminatory animus was one of the reasons, but not the only reason, for his adverse treatment—Smith's affidavit would likely be sufficient to create a genuine issue of material fact on the issue of pretext. *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989) (noting that under Title VII, "the words 'because of' do not mean '*solely* because of,'" and that the law therefore "meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations" (emphasis in original)). Smith's affidavit, after all, raises an inference that Jones's disability, a reason distinct from his violation of the USPS's zero-tolerance policy, played at least a part in the decision to fire him.

But that is not enough under the Rehabilitation Act, which, unlike Title VII, requires Jones to prove that he was fired "*solely* by reason of . . . his disability." *See Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 (6th Cir. 1995) (quoting 29 U.S.C. § 794(a)) (emphasis added). Smith's affidavit does nothing to exclude other possible reasons for Jones's termination. To the contrary, it introduces two reasons, one of which (poor performance) is a perfectly valid reason for firing an employee. Johnson's affidavit, as discussed above, raises yet another valid reason (economic pressure). Jones's own evidence thus raises three reasons apart from the USPS's proffered explanation for his firing,

only one of which relates to his claim of disability discrimination.  He therefore cannot prove that his disability constituted the "sole" reason motivating the USPS's decision to fire him.

We pause briefly to comment on the scope of the district court's summary judgment order, which was the source of some confusion at oral argument.  As noted earlier, the district court commented that Jones had "abandoned the race claim and minimized the gender and retaliation claims" after the USPS moved for summary judgment.  The court's decision accordingly focused on Jones's disability claim, leaving in doubt whether an appealable ruling had been made on his other claims.

At oral argument, Jones's counsel insisted that all of Jones's claims "are still here" on appeal despite conceding that his briefing to the district court had focused almost exclusively on the disability claim.  This discrepancy is immaterial, however, because none of the reasons for Jones's firing that are inferable from his evidence of pretext relate to race, gender, or retaliatory motivations.  Even if the district court's analysis were overly narrow, in other words, we are confident that it would have reached the same result if it had considered Jones's other claims of discrimination.  As counsel for the USPS aptly pointed out at oral argument, each of those claims would be subject to the same substantive standards and burden-shifting frameworks that applied to his disability claim.

## E.       Motion to continue

Jones also argues that the district court erred in failing to rule on his motion for a continuance.  In support of that motion, Jones set forth the following three grounds:  (1) his attorney's asthma and involvement in a political campaign "prevented him from working effectively," (2) the delay in ruling on the parties' summary judgment motions meant that the scope of the anticipated trial was ambiguous, and (3) Jones's inability to locate a potentially key witness would significantly hamper the persuasiveness of his case.  Jones has abandoned the first and second of those grounds on appeal, resting his motion-to-continue argument instead on his late discovery of Joshua Ott, the would-be favorable witness in question.

Specifically, Jones argues that, "[w]hen the trial court was made aware that there was an important material witness [Ott] on the issue of pretext, which the court was basing its [summary judgment] ruling upon, it should have held up the Opinion and Order, continued the trial, and permitted Jones to add Joshua Ott to his witness list."  The USPS opposed Jones's motion in the district court, and its brief on appeal reiterates its argument that "even if [Jones's motion] had been properly filed [i.e., on time], Ott's proposed affidavit would have done little, if anything, to refute the Postal Service's articulated reason for Plaintiff's removal."

Jones concedes that "any affidavits in opposition to summary judgment were also due with the brief on January 9, 2006," pursuant to the district court's May 2005 Case Management Order.  But Jones omits reference to the court's Civil Trial Order that was issued nearly five months later, in which the court specifically set forth the procedures that would govern continuances.  The final paragraph of that order provides in pertinent part as follows:

> No party shall be granted a continuance of a trial or hearing without a written motion
> from the party or counsel stating the reason for the continuance endorsed in writing
> by all moving parties and their lead counsel of record and filed no later than seven
> days prior to the date of trial.

(Emphasis omitted.)  The court issued a similar order in March of 2006 that repeated this language verbatim.  This latter order, which was the final pretrial order issued by the court, set the trial date for May 10, 2006.  Jones filed his motion for a continuance on May 5, 2006, only five days before trial.

Pursuant to the Federal Rules of Civil Procedure, pretrial orders "shall control the subsequent course of action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice." Fed. R. Civ. P. 16(e). Because "district courts have broad discretion to modify or enforce pretrial orders, . . . we review such rulings for an abuse of discretion." *Tatum by Tatum v. Land*, No. 95-6378, 1997 WL 85144, at *1 (6th Cir. Feb. 26, 1997).

In the present case, there is no dispute that Jones's motion for a continuance failed to comply with the express terms of the district court's pretrial order; it was two days late. We recognize that a district court's failure to articulate the reasons behind its decision (or, as in the present case, nondecision) is normally grounds for a remand. *See Bridgeport Music, Inc. v. Universal-MCA Music Pub., Inc.*, 481 F.3d 926, 2007 WL 935715, at *5 (6th Cir. 2007) (citing, as grounds for remand, the basic principle that, "[f]or the purposes of appellate review, . . . the district court must provide some indication as to why it exercised its discretion as it did").

But this court has also recognized that where, as here, the rationale for the decision is "perfectly clear" from the record—i.e., the motion was untimely—the court's silence on the issue does not necessarily prevent appropriate appellate review. *See id.*; *Spar Gas, Inc. v. AP Propane, Inc.*, No. 91-6040, 1992 WL 172129, at *1, *4 (6th Cir. July 22, 1992) (conducting a "careful review of the record" in lieu of remand because the record was "perfectly clear" regarding the specific point at issue). We therefore conclude that the court did not abuse its discretion in effectively denying, by not ruling upon, Jones's motion to continue his trial.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.