NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0055n.06

Case No. 14-5152

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 16, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DAVID ELLIS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| STATE OF TENNESSEE, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: BATCHELDER, MOORE, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. The Bradley County Election Commission fired its administrator, David Ellis, for absenteeism and for violating a state law that prohibits employees from using public funds to buy products from a company in which they have a financial interest. Ellis sued the State under the Rehabilitation Act, claiming the commission fired him based on a disability, retaliated against him for seeking a disability accommodation, and refused to accommodate his disability. The district court rejected his claims as a matter of law and granted summary judgment to the State. We affirm.

I.

From 1984 to 2006, David Ellis served as the administrator of elections for Bradley County, Tennessee. Ellis was responsible for the daily operations of the elections office and for overseeing all elections in the county. *See* Tenn. Code Ann. § 2-12-201. The elections office maintained standard business hours from 8:00 to 5:00, later changed to 8:30 to 4:30. Ellis did not lead by example. Ellis's job was a full-time job that received full-time pay. But he rarely worked a full day in the office. He never kept a regular work schedule and arrived in the office "[w]henever [he] was needed to be there," as he put it, claiming that he otherwise worked from home. R. 49-7 at 34.

In 1994, ten years into his tenure as administrator, Ellis was diagnosed with Crohn's disease, a chronic form of inflammatory bowel disease. He underwent surgery to alleviate the symptoms of the disease. Ellis took three weeks off to recuperate from the surgery, after which he worked three hours per day for ninety days. After that, the commission gave Ellis "flexibility" to go to doctor's visits during the day and to get the treatments he needed to keep his condition under control. R. 49-1 at 48. Ellis interpreted that flexibility broadly. He returned to his pre-surgery practice of unpredictable hours. That meant Ellis arrived most days between noon and 2:30 in the afternoon, and sometimes as late as 4:00 p.m. Sometimes he failed to show up for several days in a row.

Over time, Ellis's absenteeism and irregular hours created problems for the election commission. The elections office held regular business hours so members of the public or candidates could stop by to ask questions. When Ellis was not present, visitors complained to the commissioners that the administrator of elections must not be doing his job. The chairman of

2

the election commission initially tried to use humor to chastise Ellis, telling him "[he] was going to purchase a cardboard Dave and stand it up behind the counter" or post a poster with Ellis's photo under the words "Amber Alert." R. 49-1 at 35–39. The commissioners eventually took more serious measures. They formally requested that Ellis "be present in the office during all normal business hours" and account for his presence with a time sheet. R. 50-3 at 1515, 1522. Although Ellis initially responded to each request by showing up when he was supposed to, compliance was always temporary, and he would soon lapse into his irregular hours. Ellis thought the commissioners' requests were "clerical," "[not] that important," and beneath his status as "management." R. 49-8 at 43; R. 49-9 at 4. He never filled out a time sheet.

"The proverbial straw that broke the camel's back was Mr. Ellis's unannounced absence from work and unavailability by phone on April 21, 2006," recalled a commissioner. R. 45-12 at 1. April 21 fell during Bradley County's early-voting period, which Ellis was responsible for overseeing. Although Ellis claims he "had every intention of being in the office," he slept past noon and never heard the phone calls directed to him that morning. R. 49-8 at 51. As it happens, the computers at a voting precinct failed, and the commissioners were not able to locate Ellis until he woke up.

The commissioners were not pleased. That afternoon, at a meeting initiated by the five commissioners, Ellis explained to them that he overslept due to exhaustion from Crohn's-related anemia. Ellis had no explanation for why he did not tell anyone ahead of time that he would not be there due to exhaustion, why he turned his phone off, or why he did not warn anyone in the office that he might be out of reach. The commissioners suggested he take an indefinite, though paid, medical leave of absence until his doctor could affirm he was capable of working. Ellis agreed to the leave of absence.

On June 12, Ellis presented the commission with a letter from his doctor explaining that, after weeks of iron infusions, he was ready to "return to his full responsibilities and duties as an administrator without restriction." R. 50-6 at 23. Ellis asked to return to work immediately, but the commissioners agreed that they could reinstate Ellis only after a formal meeting to address his absenteeism. Due to "scheduling confusion" caused by summer vacations, the commissioners did not schedule a meeting until August 4. R. 49-1 at 108.

The delay prompted Ellis, who was still being paid in full, to complain about the Commissioners' failure to do *their* work on a regular schedule. In the press and in complaints before the Equal Employment Opportunity Commission, Ellis alleged violations of federal law, threatened to initiate federal antidiscrimination proceedings, and demanded immediate reinstatement.

At the August 4 meeting, Ellis requested reinstatement and a "reasonable accommodation of [his] disability." R. 50-3 at 18. The commission voted to "err on the side of caution" by reinstating Ellis and immediately suspending him pending "a complete investigation" into the absenteeism that preceded his medical leave and pending the results of a separate investigation initiated by the mayor into Ellis's ownership of a company that did business with the State. R. 50-3 at 32; R. 44-1 at 26.

On October 6, the commissioners unanimously voted to fire Ellis. Four of the five commissioners based their votes on Ellis's habitual absenteeism and the events of April 21. As one commissioner recalled, "I had no qualms about Mr. Ellis being absent from work when ill or in need of medical treatment. I voted to terminate his employment because he routinely failed to come to work when able." R. 45-12 at 1. One of these commissioners joined the fifth

4

commissioner in basing her vote on the results of the mayor's investigation, delivered on October 2, which found that Ellis violated Tennessee law when he used public funds to buy equipment from a company he owned.

Ellis sued the county in federal court under the Rehabilitation Act of 1973. 29 U.S.C. § 701. After nearly a decade of proceedings before the district court, including a false start over the proper defendant, *see, e.g.*, *Ellis v. Tennessee*, 491 F. App'x 659, 661 (6th Cir. 2012), the district court granted summary judgment to the State in February 2014.

## II.

*Adverse employment action solely by reason of a disability.* The Rehabilitation Act prohibits an employer (who receives federal funding) from imposing an adverse employment action against an employee "solely by reason of her or his disability." 29 U.S.C. § 794(a). Ellis targets three adverse employment actions: the commission's delay between June 12 and August 4 in deciding whether to reinstate him from paid leave; his August suspension with pull pay; and his October firing. We can put to the side the parties' arguments about whether the delay or suspension amounted to adverse employment actions. Either way, Ellis failed as a matter of law to show that the commission acted "solely by reason of" his disability with respect to each decision.

Ellis offers no direct evidence of disability-based discrimination with respect to any of the commissioners' actions. He instead relies on indirect evidence of discrimination and the burden-shifting framework that goes with it. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). This claim fails as well, however. In each instance, the commissioners offered nondiscriminatory and nonpretextual explanations for their decisions. In June, the

commissioners delayed reinstating Ellis because they wanted to have a formal meeting regarding his chronic tardiness and absenteeism. In August, the commissioners suspended Ellis to investigate his chronic failure to show up for work on a regular basis and to look into his company's business dealings with the State. In October, four of the five commissioners voted to fire Ellis "because he routinely failed to come to work when able." R. 45-12 at 1. Ellis has never suggested that his failure to arrive at work before noon or keep a time sheet was due to his disease; he simply decided unilaterally that neither requirement was necessary given his position. (Because a clear majority of commissioners relied on Ellis's tardiness, we need not consider the other ground invoked by the State for Ellis's discharge—his violation of a state law that barred using public funds to pay for products sold by a company that a public employee owns.)

Ellis claims that these explanations were pretextual because they had no basis in fact, did not motivate the commissioners, or would not suffice to motivate them in this instance. *See Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007) (noting that, in a disability-discrimination case relying on indirect evidence, an employee may demonstrate that an employer's stated reason for an employment decision was pretextual on these grounds). His first theory of pretext is this: He was habitually late, and frequently absent, for twenty-two years in this position, yet the commissioners' complaints about his tardiness began only after he took medical leave in April 2006. The record belies this theory. The commissioners began addressing Ellis's absences in 1998. While Ellis temporarily "improved his office attendance during business hours" when asked, Appellant Br. at 9, such improvement always was short lived. The commissioners' concern escalated in 2005, when they began requesting documentation that Ellis was going to work. That Ellis did not take their concerns seriously does not mean that the commissioners did not take his absenteeism seriously until 2006.

6

His second theory of pretext is this: His assistant, who was promoted to fill his job, also failed to keep a complete 8:30 to 4:30 schedule, as she routinely picked her children up from school at 3:00 or 4:00. Even if we accept the comparison—that leaving thirty to ninety minutes early is akin to arriving at noon—no evidence shows that Ellis's assistant failed to keep normal hours once she became the *administrator*, or that she failed to notify others at the commission where she was when she left the office, or that she would not keep a time sheet, or that she would not respond to phone calls when out of the office during business hours. A central problem the commission had with Ellis's absence was the lackadaisical reputation the election office was earning when visitors arrived and there was no administrator to be found. For that reason, Ellis cannot use his assistant's children (and their school and sports schedules) to demonstrate that his own absenteeism had no basis in fact, did not actually motivate the commissioners, or did not suffice to warrant his suspension and firing. The district court correctly ruled he could not persuade a jury that the commissioners acted "solely by reason of" his disability.

*Retaliation.* Ellis separately alleges that the commissioners retaliated against him. The Rehabilitation Act prohibits recipients of federal funds from retaliating against an employee who has filed a complaint against the employer about disability discrimination or has requested a "reasonable accommodation" for his or her disability. *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013). Between 1995 and July 2006, when he filed a complaint with the EEOC, Ellis never complained about or requested any accommodation that he did not receive. Hence, the relevant protected activities were the July 2006 complaint to the EEOC and his August letter to the commissioners.

No reasonable jury could believe that Ellis's July complaint or August letter caused the commissioners to suspend or fire him. The commissioners complained about Ellis's habitual

absence from work before July 2006. Some, indeed, were ready to fire him in April 2006 when no one could reach him by phone the day the computers went down. Ellis's absenteeism provided a legitimate, nonpretextual reason for firing Ellis.

Ellis counters that the temporal proximity between his protected activity (in July and August) and the firing (in October) sufficed to show that he would not have been fired but for his protected activity. But this is not a good candidate for the application of that doctrine, whatever its contours. Ellis's job was not secure before he complained and suddenly in jeopardy afterward. Ellis's protected activity occurred *while* the commission was weighing how to discipline him for misconduct that he does not dispute occurred. Any temporal proximity between his actions and the firing does not establish a cognizable claim that he would never have been fired but for his complaints.

*Reasonable accommodation.* Ellis also claims that the election commissioners discriminated against him by failing to accommodate his disability when requested. This claim, too, falls short. Ellis was provided an office with a private bathroom and a parking space next to the building in which that office was located. He received a reasonable accommodation when he asked to take time off and work fewer hours for a couple months in 1994, when he underwent surgery to alleviate the symptoms of Crohn's disease. But he never asked for any other accommodations before June 2006. All he asked for in June 2006 was to return to his job—without a disability-based accommodation—after taking leave. No accommodation was denied on this record.

For these reasons, we affirm.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** In this appeal of a grant of summary judgment, we must examine the record and view the evidence "in the light most favorable to [David Ellis,] the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (internal quotation marks omitted). We may not affirm the district court's decision to grant summary judgment in favor of Tennessee unless "[Tennessee] must prevail as a matter of law" because "a fair-minded jury could [not] return a verdict for [Ellis] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The majority does not apply that standard. Although a jury may ultimately find that Tennessee did not violate the Rehabilitation Act, I cannot say that it would be unreasonable for a jury to find that Tennessee discriminated against Ellis because of his disability or retaliated against Ellis for his request for an accommodation instead of providing a reasonable accommodation. Therefore, I dissent.