NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0499n.06

No. 23-3220

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Dec 05, 2023

KELLY L. STEPHENS, Clerk

SEMA'J GRIFFIN,

    Plaintiff - Appellant,

v.

SECRETARY OF DEFENSE,

    Defendant - Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF OHIO

OPINION

Before: BUSH, LARSEN, and MURPHY, Circuit Judges.

JOHN K. BUSH, Circuit Judge. SeMa'j Griffin worked as a college intern for the Defense Logistics Agency (DLA). Griffin's supervisors identified issues with his performance and asked for him to be reassigned to another team, but DLA fired him instead. Griffin contended that disability discrimination motivated DLA's actions, but the district court determined that Griffin failed to show sufficient evidence of disability discrimination and granted summary judgment for Defendant. As discussed below, we **AFFIRM**.

**I.**

**A. The Internship Program**

Griffin began working as a Student Intern for DLA in May 2019. Under DLA's College Internship Program, Griffin had administrative supervisors who managed the internship program and functional supervisors who managed his work on the floor. Craig White, as program manager of the internship program, ordinarily would have served as Griffin's direct administrative

supervisor, but White was in a relationship with Griffin's mother. So George Koukourakis, White's direct supervisor, served as Griffin's administrative supervisor instead.

After Griffin completed a couple of months of initial training, he went to the Surface Cell group of the Maritime Customer Operations directorate ("QMAC"), which provides logistical support for military requisitions. Michael Swiggum served as Griffin's direct functional supervisor and reported to Sally Souvannavong, branch chief of the Surface Cell group. As Griffin's functional supervisor, Swiggum trained and assigned work to Griffin.

DLA's People and Culture Directorate, which housed the college intern program, was responsible for Griffin's employment status. Colonel Samuel Payne, Jr., who led the Directorate, ultimately decided whether to fire or reassign a college intern after reviewing materials prepared by other employees within the directorate.

### B. Griffin's Performance and Termination

Griffin began struggling shortly after he joined the QMAC. While training Griffin, Swiggum noticed that Griffin would use his cell phone and not pay attention. Swiggum also observed Griffin "frequently away from his desk and wandering the halls" without explanation. Swiggum Decl., R.34-5, PageID 1501. Swiggum raised his concerns to White, who told him that Griffin had ADHD and Tourette's Syndrome. Swiggum then raised his concerns to Souvannavong about Griffin's performance, family relationship with White, and potential disability. In response, Souvannavong said that she did not "want that in my branch." Swiggum Dep., R.29, PageID 1194.

Throughout his time at the QMAC, Griffin performed poorly. He would start work late, often left his desk without explanation, and took phone calls unrelated to work. Griffin's first quarterly evaluation reflected these issues and noted that he needed to improve his organizational skills. After Griffin attended specialized training with a dedicated trainer, Griffin's second

quarterly evaluation stated that he had improved in some areas, but that he still struggled with time management, paying attention to details, and other organizational skills. For his third quarterly evaluation, Swiggum noted that Griffin did not take his work seriously, continued to spend unexplained periods of time away from his desk, and lacked focus on his tasks. Griffin's fourth, and final, quarterly evaluation restated these issues. Souvannavong never suggested changes to Griffin's evaluations.

Toward the end of his internship, Griffin told Koukourakis that his graduation was delayed, which required Griffin to extend his internship as well. This prompted Souvannavong to ask Swiggum whether he would recommend hiring Griffin as a full-time employee at the end of his internship, but Swiggum said that he would not. QMAC leadership then emailed Koukourakis, asking him to reassign Griffin to another directorate. The email expressed that, while Griffin had improved in some areas, he required extensive retraining. He also exhibited consistent issues with being away from his desk, focusing at work, recording his time, maintaining his access to required systems, spending time on his phone, attending training events, and producing poor-quality work product. QMAC leadership requested Griffin be reassigned to another directorate so that he could find success there during his remaining time.

Koukourakis relayed this request to the human resources department, but human resources recommended firing Griffin rather than reassigning him. Koukourakis then prepared a package of materials, including the email from QMAC leadership, Griffin's quarterly evaluations, and human resources's recommendation. Koukourakis sent the package to the Director of Executive Programs, who oversaw the People and Culture Directorate, and also recommended that Griffin be fired rather than reassigned. In the summary prefacing the package, the Director stated that Griffin was a "[p]oor-performing intern" who did "not seem to have much potential, let's not pass

around a problem." Koukourakis Request for Removal, R.31-1, PageID 1324. After Payne reviewed the package, he decided to fire Griffin. Koukourakis informed Griffin that he was fired on August 21, 2020.

## C. Legal Actions and Procedural History

Shortly thereafter, Griffin complained to DLA's Equal Employment Opportunity office that DLA discriminated against him based on his disability and race. After that office failed to substantiate his allegations, Griffin sued Defendant in July 2021. Following several amended pleadings and motions to dismiss, the action eventually progressed solely on a disability discrimination claim in violation of the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, alleging that DLA discriminated against Griffin because of his ADHD. Defendant moved for summary judgment on that claim, and the district court granted the motion. The district court concluded that Griffin presented no direct evidence that DLA discriminated against him based on his alleged disability and that he failed to sufficiently show indirect evidence of disability discrimination. Griffin timely appealed.

## II.

We have jurisdiction to hear this appeal under 28 U.S.C. § 1291. We review a grant of summary judgment de novo and consider the factual evidence in the light most favorable to the non-moving party, drawing reasonable inferences in the non-movant's favor. *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022). Summary judgment is warranted when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.*; Fed R. Civ. P. 56(a). "A dispute of a material fact is genuine so long as the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) (internal quotation marks and citation omitted).

**III.**

"The Rehabilitation Act forbids discrimination based on disability, and a plaintiff may prove a Rehabilitation Act violation through direct or indirect evidence." *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 578 (6th Cir. 2022). Griffin argues that the district court ignored direct evidence of discrimination and erroneously concluded that he had not presented sufficient indirect evidence that DLA fired him because of his disability.

### A. Direct Evidence of Disability Discrimination

Griffin argues that Souvannavong's statement that she did not "want that in [her] branch" after Swiggum told her that Griffin had ADHD is direct evidence of discrimination. Souvannavong Dep., R.28, PageID 1142. "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Bledsoe*, 42 F.4th at 580 (cleaned up). "Discriminatory remarks, however, are direct evidence of discrimination only when they come from a supervisor with at least a meaningful role in the decisionmaking process." *Id.* at 581 (internal quotation marks and citation omitted). When "multiple persons with various degrees of influence participated in the ultimate decision," a supervisor's statements "do not compel a discrimination finding" because "a jury would have to take inferential steps to determine the scope of [the supervisor's] role in that decision." *Id.*; *see Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002) ("It is well established that isolated and ambiguous comments are not sufficient to make out a direct-evidence case of employment discrimination.").

Souvannavong's statement does not rise to the level of direct evidence of discrimination. Because she made it after Swiggum expressed concerns about Griffin's performance, family relationship with White, and potential disability, the statement does not, on its own, indicate that discriminatory animus motivated her treatment of Griffin. Furthermore, although Souvannavong

contributed to the disciplinary process leading to Griffin's termination, Souvannavong did not act alone. The number of persons at different levels who participated in the decision to fire Griffin requires inferential findings to ascribe fault to Souvannavong, which precludes a direct discrimination finding against her.[1]

### B. Indirect Evidence of Disability Discrimination

Without direct evidence of disability discrimination for a Rehabilitation Act claim, we apply the *McDonnell Douglas* burden-shifting framework to determine whether indirect evidence of discrimination exists. *Bledsoe*, 42 F.4th at 581. "Under that framework, if a plaintiff presents sufficient evidence of a prima facie case of discrimination, an employer must offer a nondiscriminatory reason for the adverse action," which the plaintiff must then show "is a pretext for discrimination." *Id.*

#### 1. Griffin Fails to Make a Prima Facie Case of Disability Discrimination.

To establish a prima facie case, "a plaintiff must establish each of the following five elements: (1) that he is disabled, (2) that he is otherwise qualified for the job, with or without reasonable accommodation, (3) that he suffered an adverse employment action, (4) that his employer knew or had reason to know of his disability, and (5) that, following the adverse employment action, either he was replaced by a nondisabled person or his position remained open." *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007). "The final element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably." *Id.*

---

[1] While Griffin acknowledges that, for purposes of showing direct evidence of discrimination, Souvannavong was not the final decisionmaker, he contends that her actions exemplify the cat's paw theory of discrimination. That theory arises when a plaintiff "seeks 'to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.'" *Bledsoe*, 42 F.4th at 582 (quoting *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 377 (6th Cir. 2017)). But the inherent indirectness of the cat's paw theory prevents it from providing direct evidence of discrimination, so we evaluate Souvannavong's role in Griffin's termination for indirect evidence of discrimination.

(internal quotation marks and citation omitted).  At summary judgment, only elements two and five were contested.

For the fifth element, Griffin has not identified a nondisabled comparator employee or pointed to evidence that, after he was fired, Griffin was replaced by a nondisabled person or that his position remained open.[2]  This alone precludes Griffin from sustaining his burden of presenting a prima facie case of disability discrimination.

As to the second element, the record also does not establish that he was otherwise qualified for the position.  To prove he is "otherwise qualified for the job," an employee must show that he can perform its essential functions.  *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1078 (6th Cir. 1988).  Courts evaluate the essential functions of a job through a "fact-intensive analysis" considering such factors as "the amount of time spent on a particular function; the employer's judgment; written job descriptions prepared before advertising or interviewing for the position; and the consequences of not requiring the employee to perform the particular function."  *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854–55 (6th Cir. 2018) (internal quotations marks and citation omitted) (applying the factors set forth in 29 C.F.R. § 1630.2(n)(3) to an ADA claim); *see Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013) ("Claims brought under the Rehabilitation Act are reviewed under the same standards that govern ADA claims.").

The record shows that Griffin struggled to perform the essential functions of his job.  The intern job description required Griffin to "perform[] technical supply work necessary to ensure the effective operation of ongoing supply activities," demonstrate "practical knowledge of supply

---

[2] Griffin admits that he has not identified a comparator because he was the only college intern in the QMAC during his employment.  While Griffin argues that he need not follow the *McDonnell Douglas* framework to make a prima facie case, the authority he cites for this proposition expressly applies *McDonnell Douglas* to indirect evidence of disability discrimination for Rehabilitation Act claims.  *Bent-Crumbley v. Brennan*, 799 F. App'x 342, 345 (6th Cir. 2020).

operations and program requirements," and possess "the ability to apply established supply policies, day-to-day servicing techniques, regulations, or procedures." Position Description, R.31-1, PageID 1333. But Griffin lacked practical knowledge of supply operations, and he often made simple mistakes or struggled to understand his job even after a year at DLA. Similarly, his supervisors evaluated Griffin to be performing poorly: for example, even as late as Griffin's fourth quarterly evaluation, Swiggum thought that Griffin had room to improve "in all areas" and failed to correct issues identified in previous evaluations. R.29, PageID 1210–1211. He also noted that "[m]ost work products" produced by Griffin required "oversight and follow ups to complete" and that he only showed improvement when it was close to quarterly reports being due, and then he would "revert[] back to similar behavior." Swiggum Email, R.34-5, PageID 1523. As discussed, Griffin struggled to record his time properly, stay focused on tasks, or show interest in following internal procedures. And he failed to maintain the grade point average in his college coursework that the intern program required. All told, the record establishes that Griffin was not otherwise qualified to be a college intern at DLA, so he fails to make a prima facie case of disability discrimination.

### 2. *Griffin Fails to Rebut DLA's Legitimate, Nondiscriminatory Reason for Firing Him with Pretext Evidence.*

Griffin's failure to establish a prima facie case of disability discrimination ends our inquiry. But, for the sake of completeness, we also explain that Griffin has not rebutted legitimate nondiscriminatory reasons for his termination with pretext evidence. As already discussed, DLA fired Griffin for a legitimate, nondiscriminatory reason: Griffin performed poorly as a college intern. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008) ("Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment[.]").

Griffin must then rebut that reason with pretext evidence by showing "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Jones*, 488 F.3d at 406 (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Griffin first argues that Souvannavong's discrimination toward his disability, not his job performance, led to his termination. This pretext argument fails for several reasons. To begin, Payne, not Souvannavong, fired Griffin. To hold DLA liable for Souvannavong's alleged animus against Griffin, Griffin would have to show that Souvannavong was the "driving force behind" Payne's decision to fire him. *Bledsoe*, 42 F.4th at 582 (internal quotation marks and citation omitted). But the record establishes that Payne decided to fire Griffin based on an extensive report to which Souvannavong did not meaningfully contribute. Further, when Payne fired Griffin, he did not know that Griffin had a disability. Moreover, Souvannavong did not even seek Griffin's termination; she asked for Griffin to be reassigned, but others inside DLA decided to escalate the adverse action against Griffin to termination. Thus, the record does not show that Souvannavong's alleged discriminatory animus drove Payne to fire Griffin.

Next, Griffin disagrees that he in fact performed poorly. We need not belabor this point. The record shows that, although Griffin showed some improvement over time in certain areas, his overall performance fell short of what his position required.

Griffin finally contends that DLA's reasons for firing him were pretextual. He claims that, because of DLA's onerous requirements to secure a reasonable accommodation, he could not complete the reasonable accommodation process before DLA fired him. But Swiggum promptly referred Griffin to DLA's Reasonable Accommodation's office when Griffin told Swiggum about his disability, and the office provided him ample guidance about the process for requesting an

9

accommodation. Griffin did not complete the process because he failed to timely submit medical information before the COVID-19 pandemic enabled full-time telework and thus mooted his need for the accommodation. Griffin cannot fault DLA for his own tardiness.

In sum, Griffin failed to present a prima facie case of disability discrimination and failed to rebut DLA's legitimate, nondiscriminatory reason to fire him with pretext evidence.

**IV.**

Because Griffin fails to present sufficient direct or indirect evidence of disability discrimination, we **AFFIRM** the district court's summary judgment for Defendant.