RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0164p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ROBERT BLEDSOE,

*Plaintiff-Appellant*,

*v.*

TENNESSEE VALLEY AUTHORITY BOARD OF
DIRECTORS,

*Defendant-Appellee*.

┐
│
│
│
> No. 21-5808
│
│
│
┘

─────────────────

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 1:20-cv-00029—Clifton Leland Corker, District Judge.

Argued: March 17, 2022

Decided and Filed: July 27, 2022

Before: MOORE, COLE, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Douglas S. Hamill, Chattanooga, Tennessee, for Appellant. Kathleen Keough
Griebel, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee.
**ON BRIEF:** Douglas S. Hamill, Chattanooga, Tennessee, for Appellant. Kathleen Keough
Griebel, David D. Ayliffe, Lamont A. Belk, TENNESSEE VALLEY AUTHORITY, Knoxville,
Tennessee, for Appellee.

MOORE, J., delivered the opinion of the court in which COLE, J., joined.
NALBANDIAN, J. (pp. 25–30), delivered a separate dissenting opinion.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.   Robert Bledsoe, a nuclear-plant operator working for the Tennessee Valley Authority (TVA), alleges that the Authority discriminated against him based on his age and disability in violation of the Age Discrimination in Employment Act (ADEA) and the Rehabilitation Act.   Citing ethical concerns that arose when Bledsoe's son was accepted to the training program that Bledsoe taught, a committee overseeing the training center voted to demote Bledsoe from his instructor position.   One of the members of the committee, Bledsoe's supervisor, had repeatedly made disparaging remarks about Bledsoe's age and disability in the months prior to the committee's decision.   A reasonable jury could conclude that Bledsoe's supervisor used the ethical concern as a pretext to convince the other members of the committee to demote him.   We **REVERSE** the district court's judgment and **REMAND** for further proceedings.

**I. BACKGROUND**

Bledsoe has worked at the TVA, a federally owned corporation that provides utilities to the Tennessee Valley region, since 1985.   R. 30-6 (Bledsoe Dep. at 48–49) (Page ID #551); 16 U.S.C. § 831.   TVA operates two nuclear plants in Tennessee:   the Sequoyah Nuclear Plant and the Watts Bar Nuclear Plant.   *Nuclear*, Tennessee Valley Authority, https://www.tva.com/energy/our-power-system/nuclear (last visited February 4, 2022).   For most of Bledsoe's career at the TVA, he has worked as an Assistant Unit Operator (AUO) at the Sequoyah Nuclear Plant.   R. 30-6 (Bledsoe Dep. at 50–51) (Page ID #552).

The TVA runs two types of training programs at their nuclear plants:   one for AUOs, who are not licensed, and one for licensed training operators.   R. 30-1 (Dahlman Dep. at 40) (Page ID #249); R. 30-6 (Bledsoe Dep. at 60) (Page ID #554).   Only licensed training operators may teach the courses for licensed operators.   R. 30-6 (Bledsoe Dep. at 60) (Page ID #554).   The AUO training program has two types of courses.   An AUO must initially complete the Nuclear Student Generation Plant Operating (NSGPO) training course.   R. 30-5 (Williams Dep. at 15–16) (Page

ID #476–77).   Throughout the year, an AUO must also complete Non-Licensed Operator Requalification (NLOR) courses to keep requirements up to date.  *Id.* at 17–18 (Page ID #478–79).  Each nuclear plant at the TVA has a local joint training subcommittee (the Committee), which oversees the NLOR and NSGPO programs.  *Id.* at 19–20 (Page ID #480–81).

In May 2015, the Committee appointed Bledsoe to be an NSGPO instructor.  R. 30-6 (Bledsoe Dep. at 51) (Page ID #552).  In that role, Bledsoe developed lessons, exams, and course materials.  R. 30-1 (Dahlman Dep. at 58) (Page ID #254).  Bledsoe collaborated with both licensed and non-licensed instructors in all the training programs.  R. 30-6 (Bledsoe Dep. at 59) (Page ID #554); R. 30-4 (Bailey Dep. at 80–81) (Page ID #412–13).  Jeremy Bailey oversaw Bledsoe's day-to-day activities in the non-licensed training program.  R. 30-4 (Bailey Dep. at 34–35) (Page ID #366–67).  Beginning in January 2017, Christopher Dahlman, Bailey's supervisor, managed all training programs at the Sequoyah Training Center as the Operations Training Manager. R. 30-1 (Dahlman Dep. at 39–40, 58) (Page ID #249, 254).

Bledsoe took medical leave in October 2016 to manage his liver cirrhosis.  R. 24-1 (Bledsoe Decl. ¶ 3, 6) (Page ID #165–66).  In February 2017, Bledsoe returned to work after receiving a liver transplant.  R. 30-6 (Bledsoe Dep. at 63–64) (Page ID #555).  Bledsoe's condition required him occasionally to use a cane and to take medications, which he kept on his desk.  *Id.* at 18, 63, 67 (Page ID #544, 555–556).

Shortly after Bledsoe returned to work, Dahlman began to comment on Bledsoe's health and age.  *Id.* at 160–61 (Page ID #579).  Beginning in April 2017 and continuing into January 2018, Dahlman berated Bledsoe about his disability and pressured him to retire.  *Id.* at 160–64 (Page ID #579–80).  The following incidents are only some examples of Dahlman's behavior:

- After asking Bledsoe to show him his progress in updating lesson plans, Dahlman told Bledsoe, "if you're not at 100 percent, I can't use you."  *Id.* at 15 (Page ID #543).  Dahlman then asked Bledsoe about the medications that Bledsoe kept on his desk.  When Bledsoe explained that the medications treated his liver condition, Dahlman repeated, "[y]ou've got to be 100 percent for this job."  *Id.* at 15–17 (Page ID #543).  This was not the only time that Dahlman asked Bledsoe about his medications and their effect on his job.  *Id.* at 19 (Page ID #544).  One day, after asking Bledsoe to remove his

medications from his desk, Dahlman asked Bledsoe, "[j]ust how disabled are you?" *Id.* at 22 (Page ID #545).

- While discussing lesson plans in November 2017, Dahlman again asked Bledsoe, "[a]re you 100 percent yet?" When Bledsoe responded that he was "getting there," Dahlman replied, "[t]hat's not good enough . . . I'm tired of disabilities and I'm tired of medical problems." *Id.* at 31 (Page ID #547).

- Dahlman asked Bledsoe whether he had other disabilities, demanded that Bledsoe tell him about them "in detail," and asked Bledsoe whether he was "eligible for disability." *Id.* at 15, 17, 19 (Page ID #543–44). After Bledsoe told Dahlman about some of his medical problems, Dahlman responded that he was not "running a rehabilitation clinic." *Id.* at 16 (Page ID #543).

- Dahlman asked Bledsoe his age and told him numerous times that he should consider retiring. *Id.* at 16–17 (Page ID #543). These suggestions eventually turned into a command. Dahlman told Bledsoe, "you need to go ahead and retire . . . . I'm concerned about this disability you have, your condition with your liver." *Id.* at 21 (Page ID #544).

- In October 2017, after asking about Bledsoe's lesson planning progress, Dahlman commented, "I think your disability is slowing all this down. . . . You're really too old to be doing this." *Id.* at 24–25 (Page ID #545).

- In January 2018, Dahlman questioned Bledsoe's ability to teach. Again, after discussing Bledsoe's lesson-plan progress, Dahlman asked, "Are you even going to be able to teach? . . . I wouldn't think with your condition and—your medical condition and your age that you would want to teach." *Id.* at 40–41 (Page ID #549).

- Dahlman also warned Bledsoe multiple times not to "piss [him] off," telling Bledsoe that he was "vindictive" and "not patient." *Id.* at 25, 39 (Page ID #545, 549). On one occasion, Dahlman told Bledsoe, "if you piss me off, you're not going to be working over here. I'm just telling you." *Id.* at 39 (Page ID #549).

TVA employees observed Dahlman make similar comments related to age or disability about Bledsoe and others. R. 33-4 (Painter Decl. ¶ 6–7) (Page ID #832); R. 33-2 (Allen Decl. ¶ 6–7) (Page ID #826).

Bledsoe at first hesitated to notify human resources about the comments because he was afraid of Dahlman, who had previously physically and emotionally intimidated him. R. 30-6 (Bledsoe Dep. at 159–60) (Page ID #579). Around November 27, 2017, however, Bledsoe reported these incidents in a meeting with Bailey; Megan Markum, a human resources generalist;

and David Williams, the union vice president. *Id.* at 158–59, 163 (Page ID #579–80); R. 30-11 (Markum Dep. at 7) (Page ID #616). Markum responded that Bledsoe should not worry because she and Dahlman were friends and that she "d[idn't] think he would do anything." R. 30-6 (Bledsoe Dep. at 37) (Page ID #548). A few days later, Bailey told Bledsoe that he had relayed Bledsoe's complaint to Dahlman and that Dahlman was angry about it. *Id.* at 38–39 (Page ID #549). In December 2017, Bailey told Bledsoe, "I'm afraid [Dahlman] is going to try to get you out of here because he's really pissed off about you going and talking to HR." *Id.* at 169 (Page ID #581).

Meanwhile, in November 2017, Bledsoe's son Hudson had applied for a position in the NGSPO classes offered both at Sequoyah and Watts Bar. R. 30-1 (Dahlman Dep. at 80–81) (Page ID #259–60). On an employment form that asked him to rank his location preferences, Hudson indicated that he preferred a position at the Sequoyah Nuclear Plant, but that he was willing to accept employment at either location. R. 30-13 (Hudson Bledsoe Employment Affirmation) (Page ID #670). Hudson "informed the union rep that [he] would appreciate it if [he] could work at Sequoyah because of the drive but that [he] was ready to go to either plant." R. 30-18 (Hudson Bledsoe Decl.) (Page ID #724). TVA offered Hudson a position in the NSGPO training program at Sequoyah, and Hudson was expected to begin the program in March 2018. *See* R. 30-11 (Markum Dep. at 64, 114) (Page ID #630, 643). Bledsoe was scheduled to teach that same class. R. 30-16 (Michael Dep. at 41–42) (Page ID #689).

Recognizing the potential conflict of interest, Bledsoe asked Dahlman and Bailey if his son's joining the program would present a problem. R. 30-6 (Bledsoe Dep. at 132–33) (Page ID #572). Dahlman told Bledsoe not to "worry about it," but that Bledsoe could teach the NLOR program while his son was in the NSGPO program if there were an issue. *Id.*

Separately, a couple of months before this conversation, Kevin Michael, an operations management representative, had seen a list of NSGPO interview candidates and generally voiced concerns with other leaders in the operations department about familial conflicts in the class. R. 30-16 (Michael Dep. at 46–47, 52) (Page ID #690–92). Michael asked Markum to seek an ethics opinion after Hudson Bledsoe's interview. *Id.* at 54 (Page ID #692); R. 30-11 (Markum Dep. at 38) (Page ID #624).

On November 20, 2017, Markum emailed Janda Brown, the TVA Director of Ethics and Compliance.  Markum told Brown that a current AUO's son would be offered a job in the NSGPO class.  R. 30-14 (11/20/2017 Email from Markum to Brown) (Page ID #673).  Markum also stated that there were "discussions about bringing over a Reactor Operator to help teach this class.  His son will also be offered a job."  *Id.*  By the Reactor Operator, Markum was referring to Roger Brown, an employee who expressed interest in becoming an NGSO instructor, and whose son was supposed to enter the NGSO program.  R. 30-16 (Michael Dep. at 67–68) (Page ID #696).  Markum did not seek an opinion regarding the possibility of transferring Bledsoe to the NLOR program or the propriety of having an AUO teaching another non-licensed training class that his son was not in.  R. 30-11 (Markum Dep. at 45–46) (Page ID #626).  Dahlman and Bailey had told her that transfer was not a "viable option."  *Id.*

Janda Brown responded the next day, explaining that "it would be necessary for management to assign an AUO and [Reactor Operator] who do not have family members in the Student Generating Operating Plant class."  R. 30-14 (11/21/2017 Email from Brown to Markum) (Page ID #672).  Markum forwarded this response to Dahlman and Michael, stating that "Bledsoe, Roger Brown and anyone else who has an immediate family member is not eligible to work on SGPO."  R. 30-14 (11/21/2017 Email from Markum to Dahlman and Michael) (Page ID #672).  Dahlman forwarded this email to Bailey, remarking, "[l]ooks like solution will happen sooner rather than later."  R. 30-2 (11/21/2017 Email from Dahlman to Bailey) (Page ID #296).  Dahlman later testified that his comment about a "solution" was referring to performance issues Bledsoe had been having.  R. 30-1 (Dahlman Dep. at 122–23) (Page ID #270).

On November 30, 2017, the Committee met to discuss the TVA's ethics opinion.  R. 30-11 (Markum Dep. at 54–55) (Page ID #628).  The Committee was composed at the time of a training manager (Dahlman), a human resource representative (Markum), a union representative (Williams), and a management representative (Michael).[1]  R. 30-5 (Williams Dep. at 28–30)

---

[1]Dennis Dimopoulos was the official management representative as operations manager, but Dimopoulos often designated Michael, the operations superintendent, to participate in the Committee meetings.  R. 30-5 (Williams Dep. at 28–29) (Page ID #489–90); R. 30-1 (Dahlman Dep. at 66) (Page ID #256); R. 30-4 (Michael Dep. at 33–34) (Page ID #687).  Although Dimopoulos appears to have voted in favor of Bledsoe's demotion, R. 30-20

(Page ID #489–91); R. 30-1 (Dahlman Dep. at 66) (Page ID #256).  At this meeting, Dahlman and Markum insisted on removing Bledsoe from any non-licensed training program.  R. 33-3 (Smith Decl. ¶ 8) (Page ID #829).  Williams, who was Dahlman's union representative, proposed that Bledsoe be reassigned to the NLOR program, and Michael agreed.  R. 30-5 (Williams Dep. at 33–35) (Page ID #494–96); R. 33-3 (Smith Decl. ¶ 8) (Page ID #829).  Discussions continued for several weeks, during which Williams continued to advocate for Bledsoe's transfer.  R. 30-5 (Williams Dep. at 36, 44–45) (Page ID #497, 505–06).  On February 24, 2018, the Committee unanimously voted via email to remove Bledsoe from his instructor position.  R. 30-20 (2/24–2/27/2018 Committee Email Chain) (Page ID #729–32).  Bledsoe was fifty-eight years old at the time of his demotion, which went into effect on March 4, 2018, and reduced his salary by about $28,000.  R. 33-1 (Second Bledsoe Decl. ¶ 3) (Page ID #824); R. 30-20 (2/24–2/27/2018 Committee Email Chain) (Page ID #729); R. 33-6 (Bledsoe Compensation Records) (Page ID #834–35).

After filing a formal complaint with TVA's Equal Opportunity Commission, Bledsoe filed a complaint in district court, alleging violations of the ADEA and Rehabilitation Act.  R. 1 (Compl. ¶ 30–35, 36) (Page ID #7–8).  TVA moved for summary judgment, which the district court granted, dismissing all of Bledsoe's claims.  *Bledsoe v. Tennessee Valley Auth. Bd. of Dirs.*, No. 1:20-CV-00029-DCLC, 2021 WL 3612699, at *1 (E.D. Tenn. Aug. 13, 2021). Bledsoe timely appeals.

## II.  ANALYSIS

We review de novo a district court's grant of summary judgment.  *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 805 (6th Cir. 2020).  Summary judgment is inappropriate if there is a "genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  When evaluating a summary-judgment grant, "[w]e must view all of the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in the nonmoving party's favor."  *Willard*, 952 F.3d at 805–06.  In doing so, we must leave to a jury "[c]redibility determinations, the weighing of the

---

(2/27/2018 Email from Dimopoulos to Committee) (Page ID #731), neither party argues, and the record does not reflect, that Dimopoulos participated meaningfully in the Committee's decision.

evidence, and the drawing of legitimate inferences from the facts." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

**A. ADEA and Rehabilitation Act Framework**

Under the ADEA, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may prove an ADEA violation through direct or indirect evidence of discrimination, but "[n]o matter the type of evidence presented, the plaintiff retains the burden of persuasion to demonstrate 'by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision.'" *Willard*, 952 F.3d at 806 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78, (2009)).[2] "To establish a prima facie case of age discrimination, a plaintiff must show: '(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)).

Similar standards apply to Rehabilitation Act claims. *Jones v. Potter*, 488 F.3d 397, 403–04 (6th Cir. 2007). The Rehabilitation Act forbids discrimination based on disability, and a plaintiff may prove a Rehabilitation Act violation through direct or indirect evidence. *Id.* To establish a prima facie case, a plaintiff must show "(1) that he is disabled, (2) that he is otherwise qualified for the job, with or without reasonable accommodation, (3) that he suffered an adverse employment action, (4) that his employer knew or had reason to know of his disability, and (5) that, following the adverse employment action, either he was replaced by a nondisabled person or his position remained open." *Id.* at 404.

The parties do not challenge these frameworks but disagree on the causality standard. Bledsoe brings his claim under § 501 of the Rehabilitation Act, 29 U.S.C. § 791, which applies to federal employees. Bledsoe urges us to distinguish between the causation standard for claims

---

[2]The but-for causation standard applies only to Bledsoe's claim for backpay and compensatory damages under the ADEA. *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177–78 (2020). To establish that he is entitled to injunctive relief, Bledsoe need only show that "age discrimination play[ed] any part" in the decision to demote him. *Id.* at 1174, 1178.

brought under § 501 and that for claims brought under § 504 of the Act. Under § 504, an employer receiving federal funds cannot discriminate "solely by reason of [an employee's] disability." 29 U.S.C. § 794(a). This language is absent from § 501. Because "solely" does not appear in § 501, Bledsoe argues, plaintiffs bringing § 501 claims need not satisfy this stringent causation standard. TVA argues that § 504's "solely by reason of" standard applies to all Rehabilitation Act claims, no matter which section.

To understand the differences between § 501 and § 504 of the Rehabilitation Act, we first examine the Act's structure and history. As the First Circuit has helpfully explained, in the first iteration of the Act, § 501 required that federal agencies adopt affirmative-action plans to hire and advance opportunities for individuals with disabilities. *Bartlett v. Dep't of the Treasury (I.R.S.)*, 749 F.3d 1, 5 (1st Cir. 2014). Section 504 prohibited private entities receiving federal funds from discriminating "solely by reason of" the disability. *Id.* at 5–6. Although neither section contained a private cause of action for federal employees at the time, all courts interpreting the Rehabilitation Act read an implied right of action into § 504, but not § 501. *Id.* at 6.

Congress then codified a private right of action for federal employees under the Rehabilitation Act, but it did so in a "less than artful manner." *Id.* (quoting *Spence v. Straw*, 54 F.3d 196, 199 (3d Cir. 1995)). The Senate added § 505 to the Rehabilitation Act, 29 U.S.C. § 794a, which extended the remedies available under Title VII of the Civil Rights Act (including a private cause of action for damages) to federal employees who brought claims under § 501. *Id.* This amendment also extended the remedies available under Title VI of the Civil Rights Act to claims brought under § 504. *Id.* at 6–7. At the same time, the House amended § 504 to prohibit not only entities receiving federal assistance but also "any program or activity conducted by an Executive agency or by the United States Postal Service" from discriminating "solely by reason of" disability. *Id.* at 7 (quotations omitted). Thus, as the Fifth Circuit has explained, "[t]he amendments to section 504 were simply the House's answer to the same problem that the Senate saw fit to resolve by strengthening section 501." *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292, 304 (5th Cir. 1981). Congress "could have chosen to eliminate the partial overlap between the two provisions, but instead . . . chose to pass both provisions, despite the overlap." *Id.*

Given this overlap, some circuits have recognized only one cause of action under § 501 of the Rehabilitation Act. *See Pinkerton v. Spellings*, 529 F.3d 513, 515 (5th Cir. 2008) (noting circuit split). We have distinguished the two sections, however, and long held that "federal employees . . . alleging [disability] discrimination in employment may maintain private causes of action against their employers under *both* sections 501 and 504 of the Rehabilitation Act." *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1077–78 (6th Cir. 1988).

We have never addressed whether § 504's sole-cause standard applies to § 501 claims. As TVA points out, in *Lewis v. Humboldt Acquisition Corp.*, we distinguished between Americans with Disabilities Act (ADA) claims and Rehabilitation Act claims, holding that a "but-for" causality standard applies to ADA claims and that a "sole-cause" standard applies to Rehabilitation Act claims. 681 F.3d 312, 317, 321 (6th Cir. 2012) (en banc). But the plaintiff in *Lewis*, an employee of a private entity, could bring only a § 504 claim. *Id.* at 314. We therefore did not analyze any differences between the two types of claims. Although we have since applied *Lewis*'s sole-cause standard in unpublished cases with federal-employee plaintiffs, those cases likewise did not distinguish between § 501 and § 504 claims. *See, e.g.*, *Kaminsky v. Wilkie*, 856 F. App'x 602, 602, 604–05 (6th Cir. 2021); *Bent-Crumbley v. Brennan*, 799 F. App'x 342, 344–45 (6th Cir. 2020) (per curiam).

The only court to address this issue directly has interpreted the statute in Bledsoe's favor. *Pinkerton*, 529 F.3d at 516*; see also Dank v. Shinseki*, 374 F. App'x 396, 399 n.4 (4th Cir. 2010) (noting that issue remains unresolved in all but one circuit). In *Pinkerton*, the Fifth Circuit looked to § 501(g) of the Rehabilitation Act (now codified at § 501(f)), which incorporates ADA standards "to determine whether this section has been violated," to apply the ADA's causality standard to § 501 claims. 529 F.3d at 516–17. Noting that the ADA, which was passed in 1990, excludes the federal government from coverage, the court reasoned that the 1992 Rehabilitation Act Amendments sought to expand ADA protections to federal employees. *Id.* at 517. The court also observed that Equal Employment Opportunity Commission regulations implementing § 501 of the Rehabilitation Act incorporate ADA standards. *Id.*

The Fifth Circuit's reasoning persuades us that § 504's sole-cause standard does not apply to claims brought under § 501. Causality is clearly a "standard[] used to determine

whether [§ 501] . . . has been violated," so § 501(f) instructs us to apply ADA causality standards. 29 U.S.C. § 791(f). Although TVA argues that we should look to the more specific standards of causality governing § 504 claims, we, like the Fifth Circuit, see no reason to borrow from § 504 when § 501 already describes the relevant standard.

As the court in *Pinkerton* noted, § 501 and § 504 sensibly employ different causality standards because they are distinct sections of the Rehabilitation Act. 529 F.3d at 517. The Supreme Court recognized this distinction when it observed that a plaintiff may recover monetary damages under § 501, and not § 504, because Congress waived its sovereign immunity with respect to only the former section. *See Lane v. Pena*, 518 U.S. 187, 193 (1996). The sections' discrete purposes further explain their differences: § 501 imposes an "affirmative action obligation [that] goes beyond the obligation set forth in [§] 504, which, by its terms, requires only non-discrimination." *Hall*, 857 F.2d at 1077. This "duty" that Congress chose to impose upon only federal employers under § 501, *id.* (quoting *Prewitt*, 662 F.2d at 306), logically renders it easier for federal employees to prove discrimination than for private-entity employees. Considering Congress's belt-and-suspenders approach to expanding federal employees' rights, we decline to hold federal employees to a more stringent causality standard than employees of private entities receiving federal funding.

Congress has clearly delineated two separate causes of action under two separate provisions of the Rehabilitation Act. *See Hall*, 857 F.2d at 1077. Under the ADA and § 501, a plaintiff must show that discrimination was a "but-for" cause of the adverse employment action. *Lewis*, 681 F.3d at 321. Applying this standard here, federal-employee plaintiffs like Bledsoe who bring § 501 claims must show that they would not have been subject to the adverse action but for the discrimination.

**B.  Direct Evidence of Discrimination**

Having determined the proper causality standard, we turn to the evidence that Bledsoe offers to support his discrimination claims. To show that age or disability discrimination was a "but-for" cause under either the ADEA and Rehabilitation Act, Bledsoe may use either direct or

indirect evidence.  *Willard*, 952 F.3d at 806 (ADEA); *Jones*, 488 F.3d at 409 (Rehabilitation Act).

Bledsoe first argues that Dahlman's statements are direct evidence of age and disability discrimination.  "Direct evidence is 'evidence that proves the existence of a fact without requiring any inferences.'"  *Willard*, 952 F.3d at 806 (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007)).  The evidence, on its own, must lead a reasonable juror to conclude that a decisionmaker was biased, and that adverse animus motivated the adverse action. *See Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 530 (6th Cir. 2014).

Dahlman's statements—especially those questioning Bledsoe's ability to teach due to his age and disability—would arguably constitute direct evidence of unlawful discrimination had the extent of his influence on the Committee been obvious.  *See Willard*, 952 F.3d at 806–07. Discriminatory remarks, however, are direct evidence of discrimination only when they come from a supervisor with at least a "meaningful role in the decisionmaking process."  *Bartlett v. Gates*, 421 F. App'x 485, 489 (6th Cir. 2010).  For example, a biased supervisor's unilateral recommendation to a manager with dismissal authority to fire a plaintiff constitutes direct evidence.  *DiCarlo v. Potter*, 358 F.3d 408, 416 (6th Cir. 2004).  By contrast, Dahlman's statements and his supervisory status alone do not compel a discrimination finding because multiple persons with various degrees of influence participated in the ultimate decision. Although Dahlman participated in the decision to demote Bledsoe, a jury would have to take inferential steps to determine the scope of Dahlman's role in that decision.  To prevail, Bledsoe must therefore offer indirect evidence of discrimination.

## C.  Indirect Evidence of Discrimination

When a plaintiff presents indirect evidence in support of an ADEA or a Rehabilitation Act claim, the *McDonnell Douglas* burden-shifting framework governs.  *See Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326 (6th Cir. 2021); *Jones*, 488 F.3d at 403–04.  Under that framework, if a plaintiff presents sufficient evidence of a prima facie case of discrimination, an employer must offer a nondiscriminatory reason for the adverse action.  *Sloat v. Hewlett-*

*Packard Enter. Co.*, 18 F.4th 204, 209 (6th Cir. 2021). The plaintiff then must demonstrate that the employer's reason is a pretext for discrimination. *Id.*

TVA does not contest that Bledsoe has established a prima facie case of discrimination. Instead, TVA argues that ethical concerns justified Bledsoe's demotion and that Bledsoe has failed to show that those concerns were pretextual. To demonstrate pretext, Bledsoe must show that the ethical concerns "(1) had no basis in fact; (2) did not actually motivate the adverse action; or (3) w[ere] insufficient to warrant" the demotion. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 421 (6th Cir. 2021). Bledsoe argues that he has provided evidence of the latter two factors—that the ethics concern did not actually motivate or warrant the decision to demote him.

Bledsoe first points to the remarks themselves. "[D]iscriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009); *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354–55 (6th Cir. 1998). We take no inferential leap in concluding that Dahlman's litany of ageist and ableist insults—numerous inquiries about Bledsoe's retirement, proclamations about not "running a rehabilitation clinic," invasive questions about his medications and his cane, and encouragement that Bledsoe file for disability—exhibited age and disability discrimination.

A juror could further infer that Dahlman desired that Bledsoe stop teaching. Dahlman believed that Bledsoe's disability "slow[ed]" down his lesson planning and that Bledsoe was "too old" to be teaching. R. 30-6 (Bledsoe Dep. at 24–25) (Page ID #545). In fact, Dahlman admitted that Bledsoe's demotion was his "wish at the time," and that his demotion would be a welcome "solution." R. 30-1 (Dahlman Dep. at 117–18) (Page ID #269); R. 30-2 (11/21/2017 Email from Dahlman to Bailey) (Page ID #296). A reasonable juror could reject Dahlman's explanation for these comments—that he was displeased with Bledsoe's performance, R. 30-1 (Dahlman Dep. at 118) (Page ID #269)—and credit Bledsoe's explanation, that Dahlman was pleased because he thought Bledsoe was too old and disabled to keep his position.

From these facts, a juror could infer that Dahlman's bias motivated his wish that Bledsoe stop teaching. "We must therefore determine whether a reasonable jury could conclude that

[Dahlman] was in a position to influence the alleged decision" to demote Bledsoe. *Ercegovich*, 154 F.3d at 355. In support, Bledsoe invokes a variation on a vicarious-liability theory called the "cat's paw" theory. Under that theory, a plaintiff "seeks 'to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.'" *Marshall v. The Rawlings Co.*, 854 F.3d 368, 377 (6th Cir. 2017) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)). We have previously applied the cat's paw theory to hold an employer liable when a biased employee influenced a committee's employment action. *See DeNoma v. Hamilton Cnty. Ct. of Common Pleas*, 626 F. App'x 101, 106–08 (6th Cir. 2015). In this context, Bledsoe must show that Dahlman "was the driving force" behind the Committee's decision to demote him. *Wyatt*, 999 F.3d at 421. In short, a reasonable juror must be able to find that Dahlman proximately caused Bledsoe's demotion. *See Sloat*, 18 F.4th at 210.

When a decisionmaker relies on a biased employee's knowledge about the employee subject to an adverse action, a jury may reasonably infer that the biased employee proximately caused the adverse action. For example, in *Gutzwiller v. Fenik*, a defendant's discriminatory intent "more likely than not" caused the plaintiff's denial of tenure. 860 F.2d 1317, 1327 (6th Cir. 1988). In that case, members of a university committee that denied plaintiff tenure "lacked the expertise to properly judge [plaintiff's] work and, therefore, relied exclusively upon the opinion of" the committee chairman, who had exhibited discriminatory animus. *Id.* More recently, we held that a biased employee proximately caused an adverse action when a supervisor who had little knowledge about the plaintiff's capabilities relied upon the biased employee's information. *Sloat*, 18 F.4th at 212–13.

Bledsoe similarly presents sufficient evidence that Dahlman influenced the three other members of the Committee because they deferred to his opinion. Markum, the human resources specialist, "relied heavily" on Dahlman and Bailey's opinion to conclude that only demotion could resolve the ethics issue. R. 30-11 (Markum Dep. at 42–43) (Page ID #625). Because Dahlman and Bailey told her that it was not "a viable option," Markum did not ask the ethics department if Bledsoe's or his son's transfer would cure the ethics issue. *Id.* at 45–46 (Page ID #626). Markum's reliance was based not only on Dahlman's role as a training specialist, but also on her personal friendship with Dahlman. When Bledsoe complained to Markum about

Dahlman's comments, Markum told Bledsoe that she and Dahlman were friends and that she "[didn't] think he would do anything." R. 30-6 (Bledsoe Dep. at 35–37) (Page ID #548). In fact, Dahlman had told Bledsoe that he had previously discussed with Markum that Bledsoe should file for disability. *Id.* at 27–28 (Page ID #546). A reasonable juror could thus find that Dahlman influenced Markum to demote Bledsoe to the exclusion of other options.

A juror could also find that Dahlman's influence did not stop with Markum because Michael and Williams either deferred to Dahlman's judgment, were intimidated by Dahlman, or otherwise were influenced by him. Beginning with Michael, a jury could find that Michael deferred to Dahlman on the decision to demote Bledsoe. Michael did not have responsibilities over the training center. R. 30-11 (Markum Dep. at 45–46) (Page ID #626). Michael was never an instructor or manager in the Sequoyah Training Center program, had no direct supervision responsibilities in the program, and testified that Dahlman and Bailey knew more about training than he did. R. 30-16 (Michael Dep. at 60–61) (Page ID #694). As the dissent notes, Michael did have first-hand knowledge about training operations from his time as a student and about labor-related issues from his role as operations superintendent. Dissent Op. at 27–28. Michael also provided during his deposition an entirely reasonable explanation, rooted in the ethics concerns, for Bledsoe's demotion. *Id.*

The record, however, reveals a few reasons to view with skepticism Michael's testimony that he was independently concerned about the ethics issue from the start. For example, according to Bledsoe, Bledsoe asked Michael about his son's participation in NGSPO during his son's interview process. R. 30-6 (Bledsoe Dep. at 134) (Page ID #573). Michael asked Bledsoe what Dahlman thought, and when Bledsoe responded that Dahlman said the conflict would not be an issue, Michael told Bledsoe not to "worry about it." *Id.* Moreover, a participant in a Committee meeting testified that Michael initially voiced support for transferring Bledsoe to NLOR rather than removing Bledsoe from the training program. R. 33-3 (Smith Decl. ¶ 8) (Page ID #829). Michael denied ever opposing Bledsoe's removal. R. 30-16 (Michael Dep. at 73–74) (Page ID #697). Finally, Dahlman told Michael about Bledsoe's "performance struggles" on multiple occasions prior to the ethics discussion. *Id.* at 36, 88 (Page ID #688, 701). The contradictions in Michael's testimony, combined with his knowledge about Dahlman's problems

with Bledsoe, raise a host of credibility questions about Dahlman's influence and the true extent of Michael's concern about the ethics issue during the relevant time. Juries, rather than judges, are better situated to resolve those questions. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

Meanwhile, Dahlman and Markum were "adamant" that Bledsoe be demoted rather than transferred to NLOR, even when Williams and Michael were initially in favor of the latter option. R. 33-3 (Smith Decl. ¶ 8) (Page ID #829). Williams, who found Dahlman "intimidating" and described Dahlman as a "bully," supported Bledsoe's transfer during the weeks of discussion that followed and even agreed that transferring Bledsoe would have resolved the conflict. R. 30-5 (Williams Dep. at 34–36, 52) (Page ID #495–97, 512). But, over time, something happened to change Williams's mind. The dissent cites Williams's initial advocacy for Bledsoe and the passage of time as evidence that the Committee made a reasoned decision after weighing all the options. Dissent Op. at 26–27. That explanation, though reasonable, fails to draw inferences in the light most favorable to Bledsoe. Equally plausible is a scenario in which Williams slowly capitulated to Dahlman's and Markum's pressure to vote to demote Bledsoe. After all, according to Williams, "[Dahlman] like[d] it his way. If you could convince him it was his idea, he was all for it. If it was your idea, he questioned it." R. 30-5 (Williams Dep. at 51) (Page ID #512). As Michael testified, moreover, the Committee strove for a unanimous result, rendering it likely that some members persuaded others to vote in certain ways. R. 30-16 (Michael Dep. at 102–03) (Page ID #704–05). Viewing these facts in Bledsoe's favor, a reasonable juror could find that over time, Dahlman's and Markum's strong opinions overpowered those of Williams and Michaels.

That the Committee voted unanimously for demotion does not foreclose Bledsoe's claim. *Gutzwiller*, 860 F.2d at 1327. The Supreme Court indicated as much in *Reeves v. Sanderson Plumbing Products*. 530 U.S. at 152–53. In that case, multiple company managers, including one who discriminated against the plaintiff, recommended to the president of a company that the plaintiff be fired. *Id.* at 138. The Court admonished the appellate court, which granted summary judgment to the employer, for "giving weight" to the other managers' lack of animus and "discredit[ing]" the plaintiff's evidence that the biased manager made the decision. *Id.* at 152–

53.    Group decisions—especially small group decisions—often involve deference to an experienced or passionate member, and one person's influence often leads to a unanimous result. Construing the evidence in Bledsoe's favor, a jury could determine that is what happened here.

TVA argues that Dahlman's negative animus could not have motivated Bledsoe's demotion because Dahlman did not create the ethics conflict or initiate the ethics inquiry. That argument, however, unfairly characterizes Bledsoe's claim. Bledsoe argues that there were multiple reasonable alternatives to demotion, and that Dahlman's influence convinced the Committee to reject those alternatives. The ethics problem, according to Bledsoe, was thus a convenient excuse—a pretext—that Dahlman could use to convince the Committee to demote him. Indeed, "when an 'employer . . . waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee,' the employer's actions constitute 'the very definition of pretext.'" *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009) (quoting *Jones*, 488 F.3d at 408). Even if the ethics inquiry began with Michael, it is entirely believable, rather than "odd," Dissent Op. at 27, that Dahlman would jump at the opportunity to press for a convenient "solution" to his problems with Bledsoe once Michael raised an ethics concern. R. 30-2 (11/21/2017 Email from Dahlman to Bailey) (Page ID #296). Once Michael raised the ethics problem, demoting Bledsoe was not the only available solution. It is also entirely believable that Dahlman convinced the Committee, including Michael, to ignore alternatives after Michael initiated the discussion.

Bledsoe offers multiple alternatives to demotion that TVA could have considered. TVA could have transferred Bledsoe to a NLOR instructor position or transferred his son to another plant location. Other instructors with significant experience in the NLOR and NGSPO programs agreed that these alternatives were viable. R. 33-3 (Smith Decl.¶ 3–4, 9, 10) (Page ID #828, 829–30); R. 33-2 (Allen Decl. ¶ 3, 4, 8) (Page ID #825–26). Williams also agreed that transferring Bledsoe would have resolved the conflict. R. 30-5 (Williams Dep. at 34–36, 38) (Page ID #495–97, 499). Bledsoe's son, moreover, was willing to transfer to Watts Bar to resolve the ethics concerns, and the final roster of students had not been determined at the time that the Committee was considering the ethics issue. R. 30-1 (Dahlman Dep. at 116) (Page ID

#268); R. 30-5 (Williams Dep. at 38) (Page ID #499); R. 30-18 (Hudson Bledsoe Decl.) (Page ID #724); R 30-16 (Michael Dep. at 76) (Page ID #698).

In response, TVA argues that the demotion decision could not have been pretextual because the alternatives were impracticable. TVA contends that it could not "adequately separate" the NLOR and NGSPO programs to avoid the appearance of an ethical conflict and that staffing concerns prevented the transfer. TVA further maintains that it could not transfer Bledsoe's son because Bledsoe's union referred Hudson to TVA, and Hudson preferred the Sequoyah plant. R. 30-16 (Michael Dep. at 94–95) (Page ID #702–03).

Bledsoe raises genuine disputes of fact to counter TVA's points. First, Bledsoe rejects TVA's distinction between him and the other instructors with sons in other training programs because all instructors at the Sequoyah Training Center have access to all exams. R. 33-3 (Smith Decl. ¶ 10–11) (Page ID #829–30); R. 33-2 (Allen Decl. ¶ 4) (Page ID #825). Second, Bledsoe points out that all the members of the Committee agreed that his son's transfer would have resolved the ethics concern. R. 30-11 (Markum Dep. at 64–65) (Page ID #630–31); R. 30-1 (Dahlman Dep. at 116) (Page ID #268); R. 30-16 (Michael Dep. at 78–79) (Page ID #698–99); R. 30-5 (Williams Dep. at 38) (Page ID #499); R. 30-6 (Bledsoe Dep. at 152–55) (Page ID #577–78).

A jury is best positioned to resolve these factual disputes. Reasonable alternatives to demotion render it more likely—although not certain—that Dahlman, rather than the ethical conflict, caused Bledsoe's demotion. The jury, rather than the court, should decide which explanation seems more plausible. *See Marshall*, 854 F.3d at 382 (holding genuine disputes of material fact existed when it was "not clear that [plaintiff's] performance . . . justified a demotion"); *cf. Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019).

TVA disagrees, arguing that we should instead defer to its judgment under the honest-belief rule.**[3]** Under that rule, if an employer honestly believes in a mistaken or baseless reason

---

**[3]**Bledsoe argues that TVA waived its arguments regarding the honest-belief rule because it raised them for first time in its reply brief before the district court. We decline to construe waiver so strictly. Bledsoe's arguments regarding pretext, raised in response to TVA's summary-judgment motion, prompted TVA's honest-belief arguments. "[A]n 'issue raised for the first time in defendant's response to plaintiff's reply brief for summary

for the adverse action, the employer lacks discriminatory intent, and the action cannot be pretextual. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). TVA argues that even if it were mistaken that there were no reasonable alternatives to demoting Bledsoe, the honest-belief rule prevents Bledsoe from establishing pretext, and consequently discrimination, because the Committee considered and rejected alternatives in good faith.

The honest-belief rule, however, does not command blind deference to an employer's business judgment in any employment-discrimination action. Applying the rule makes sense only when a plaintiff relies solely on irrational bases for an employer's actions to demonstrate pretext. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 890 n.5 (6th Cir. 2020); *Amos v. McNairy County*, 622 F. App'x 529, 541 n.10 (6th Cir. 2015). To show pretext here, Bledsoe relies both on the existence of reasonable alternatives to demotion and on evidence of Dahlman's negative animus and influence on the Committee under a cat's paw theory. When a plaintiff invokes the cat's paw theory, "the honesty or sincerity of the decisionmaker's belief is irrelevant. What is relevant is that the belief is rooted in a biased recommendation." *Marshall*, 854 F.3d at 380. Indeed, a cat's paw theory is premised upon an unbiased decisionmaker and therefore always involves a decisionmaker with sincere beliefs.

In other words, the honest-belief rule does not defeat a cat's paw theory because, under that theory, the bias of the influencing employee influences the otherwise neutral decision. It follows, then, that an employer may still raise the honest-belief rule if the decisionmaker conducts an "in-depth and truly independent investigation" showing that the adverse action is warranted for reasons unrelated to the bias. *Id.* at 380. An independent investigation defeats a cat's paw claim only when the investigation "determin[es] that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* (quoting *Staub*, 561 U.S. at 421).

TVA argues that there was just such an independent investigation here because TVA's ethics director, who was not on the Committee, determined that hiring Bledsoe's son would cause problems. No evidence, however, shows that the ethics director considered or

---

judgment [is] not waived,'" moreover, when "the district court fully addressed the argument in its order and [when] both parties fully briefed the issue on appeal." *Salling v. Budget Rent-A-Car Sys., Inc.*, 672 F.3d 442, 444 (6th Cir. 2012) (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)).

recommended any alternatives to demotion.  The ethics director merely stated that an ethics issue would arise if Bledsoe taught his son, a proposition that Bledsoe does not dispute.  R. 30-14 (11/21/2017 Email from Brown to Markum) (Page ID #672); R. 30-6 (Bledsoe Dep. at 134–35) (Page ID #573).  To the extent that the Committee itself investigated alternatives, Dahlman's participation negates that independence, and forecloses application of the honest-belief rule.

Finally, to show that the ethical concerns did not warrant demotion, Bledsoe offers evidence that other Sequoyah Training Center instructors had sons entering various training programs and were not subjected to an ethics inquiry, much less demoted.  R. 33-3 (Smith Decl.¶ 12) (Page ID #830); R. 33-2 (Allen Decl. ¶ 8) (Page ID #826); R. 30-11 (Markum Dep. at 50–52) (Page ID #627).  A plaintiff offering comparator evidence to demonstrate pretext must show that the comparator is similar in "all relevant respects."  *Miles*, 946 F.3d at 893 (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012)).  Whether the comparison between similarly situated individuals is sufficiently relevant is itself a jury question.  *See Strickland v. City of Detroit*, 995 F.3d 495, 514 (6th Cir. 2021).

Here too, questions of fact remain.  TVA rejects Bledsoe's comparison to similarly situated instructors because those instructors were teaching programs with different licensing requirements than the programs in which their sons were enrolled.  R. 30-11 (Markum Dep. at 50–53) (Page ID #627–28).  Bledsoe offers testimony from other Sequoyah instructors that the licensing and non-licensing programs were similar in all relevant respects.  For example, the instructors who were not demoted had access to their sons' exams because all instructors—licensed and non-licensed—have access to all exams.  R. 33-3 (Smith Decl.¶ 11) (Page ID #830); R. 33-2 (Allen Decl. ¶ 4) (Page ID #825).  As much as the dissent would like to credit TVA's explanation for why that fact is irrelevant, Dissent Op. at 29 n.5, that task is for the jury.  *See Strickland*, 995 F.3d at 514.  Because, as discussed, the honest-belief rule does not shield TVA, at trial, a juror will be able to weigh the competing testimony and determine whether the similarities between the licensed and unlicensed programs are relevant enough.

TVA also offers its own comparator evidence, emphasizing that the Committee determined that Roger Brown could not work as an NSGPO instructor because his son was also an NSGPO student.  R. 30-14 (Email from Markum to Michael and Dahlman) (Page ID #672);

R. 30-16 (Michael Dep. at 55–56) (Page ID #693).  Such evidence, "although relevant, is certainly not dispositive." *Reeves*, 530 U.S. at 153.  Bledsoe again raises a factual dispute regarding TVA's motives here:  Roger Brown was not similarly situated because he had merely expressed interest in the Sequoyah Training Center instructor position but was never an instructor.  R. 30-16 (Michael Dep. at 67–68) (Page ID #696).  A reasonable juror could weigh this evidence and find that TVA reasonably declined to appoint Brown—who had no experience teaching—to an instructor position, while it improperly demoted Bledsoe—who had been teaching for many years—due to Dahlman's negative animus.  Namely, because there was less impetus for TVA to hire Brown as a new instructor, it is more reasonable that TVA would decline to explore solutions to resolve Brown's conflict than for Bledsoe's.  This distinction might "carry the day" in the eyes of a juror, and it may not.  Dissent Op. at 29.  In any case, comparator evidence is not dispositive, and therefore, a jury should evaluate its relevance.  *See Reeves*, 530 U.S. at 153.

At bottom, the "ultimate inquiry" in establishing pretext is whether the employer took the adverse action for the stated reason. *Miles*, 946 F.3d at 888 (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)).  Bledsoe has provided evidence supporting the following facts:  (1) Dahlman harbored age- and disability-based animus against Bledsoe, (2) Dahlman wished that Bledsoe would stop teaching, (3) Dahlman was a member of the Committee, (4) Committee members did not have independent knowledge about training-center operations and deferred to, or were otherwise swayed by, Dahlman, and (5) the Committee did not consider reasonable alternatives to demotion.  From these facts, a jury could infer that Dahlman's age- and disability-based bias motivated him to influence the Committee's decision to demote Bledsoe rather than transfer him or his son.  Summary judgment on Bledsoe's ADEA and Rehabilitation Act claims was therefore unwarranted.

## D.  Retaliation

Finally, Bledsoe argues that the district court incorrectly dismissed his retaliation claim.  Retaliation claims established through indirect evidence are also governed by the *McDonnell Douglas* burden-shifting framework.  *Blizzard*, 698 F.3d at 288.  Bledsoe therefore must first establish a prima facie case, showing that he (1) "engaged in a protected activity, (2) the

defending party was aware that the [plaintiff] had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and [the] adverse action." *Id.* (ADEA retaliation claims); *see also Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (Rehabilitation Act retaliation claim). Again, if TVA offers a non-discriminatory explanation for the adverse action, the burden shifts to Bledsoe to show pretext. *Blizzard*, 698 F.3d at 288. Bledsoe argues that not only discrimination but also retaliation in response to his November 2017 human resources complaint motivated Dahlman to influence the Committee to demote him.

TVA contests only the causation element of that claim.[4] "To prove a causal connection, [a plaintiff] must produce sufficient evidence from which an inference can be drawn that the [defendant] took the adverse employment action because [the plaintiff]" engaged in protected activity. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004). A plaintiff who shows that the adverse action occurred immediately after the protected activity may be able to rely on temporal proximity alone to overcome a motion for summary judgment. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). But when "some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

Bledsoe has produced both evidence of temporal proximity and other evidence of retaliation. Only three months passed between Bledsoe's late-November 2017 complaint to Markum and his February 2018 demotion, an interval that is probative of retaliatory motive. *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc); *Singfield*, 389 F.3d at 563. Bledsoe also offers (1) Bailey's statements shortly after Bledsoe's complaints to

---

[4]Bledsoe first argues that TVA waived this argument because it "conceded" in its summary-judgment briefing below that Bledsoe established a prima facie case of retaliation. Reply Br. at 18. However, TVA only assumed "arguendo that Mr. Bledsoe c[ould] establish a prima facie case for . . . retaliation." R. 31 (Memo in Supp. of Mot. for S.J. at 15) (Page ID #782). Such an assumption is not an "intentional relinquishment" of a right sufficient to support waiver. *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). To the extent Bledsoe claims that TVA forfeited its argument by failing to raise it below, we nevertheless address it because the district court analyzed the causation issue, which has been fully briefed on appeal. *See United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011).

Markum—that Dahlman was "pissed" about Bledsoe's report to Human Resources, (2) Bailey's December 2017 statement to Bledsoe which said that he was "afraid Chris [Dahlman was] going to try to get [Bledsoe] out of here because he's really pissed off about [Bledsoe] going and talking to HR," and (3) Dahlman's warnings to Bledsoe that he was "vindictive" and that Bledsoe should never "piss [him] off." R. 30-6 (Bledsoe Dep. at 25–26, 31, 38–39, 168–69) (Page ID #545–46, 547, 549, 581). A reasonable juror could believe this testimony and conclude that retaliation motivated Dahlman improperly to influence the Committee.

TVA argues that Bledsoe's timing does not add up because Bledsoe complained to Markum after the Committee had already initiated its ethics inquiry on November 27, 2021. Although an employer "proceeding along lines previously contemplated, though not yet definitively determined" is not, by itself, evidence of causality, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001), the timing of the demotion is suspicious even if the ethics inquiry had already begun before Bledsoe's complaint. Again, the adverse employment action that Bledsoe is challenging is demotion rather than the ethics inquiry itself. Therefore, the causal link that is relevant here is the link between Bledsoe's complaint to Human Resources and his demotion. And here, a reasonable juror could find that Bledsoe complained to Human Resources around the same time that the ethics inquiry was initiated and that Dahlman retaliated for that complaint by pushing the Committee to demote Bledsoe rather than take other reasonable measures.

TVA cites two cases in which we have upheld summary-judgment grants on retaliation claims, but neither applies here. In *Blizzard*, the adverse employment action occurred significantly longer than three months—"more than a year"—after the plaintiff's protected activity and the plaintiff provided no other evidence that the activity caused her termination. 698 F.3d at 289. And in *Ford*, the plaintiff did not provide any evidence similar to Bledsoe's testimony about Dahlman's statements linking the adverse action to her complaints. 782 F.3d at 767–70. Although TVA characterizes the form of Bledsoe's evidence, his own deposition testimony, as "self-serving," we have repeatedly held that such a label "does nothing to undermine the other side's evidence under Rule 56." *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 841 (6th Cir. 2021) (collecting cases). Bledsoe's testimony recounting Dahlman's retaliatory sentiments raises disputes of fact sufficient to survive summary judgment.

As for pretext, the same facts supporting Bledsoe's discrimination claim support his retaliation claim. *See Marshall*, 854 F.3d at 384 (reversing grant of summary judgment on discrimination claim and noting similar disputes regarding decision-maker bias and influence relevant to retaliation claim). Bledsoe has presented enough evidence to show, under a cat's paw theory, that Dahlman's negative animus, rather than the ethics concern, drove the Committee's decision to demote him. Bledsoe has also presented enough evidence to show that both discrimination and retaliation motivated Dahlman's negative animus. Therefore, the district court incorrectly dismissed Bledsoe's retaliation claim.

### III.  CONCLUSION

Bledsoe has presented evidence from which a reasonable juror could find that Dahlman frequently criticized him about his age and disability. Viewing the facts and drawing inferences in the light most favorable to Bledsoe, a jury could find that Dahlman persuaded the other Committee members to demote him rather than find a reasonable alternative to resolve the ethics issue. Although a jury could reasonably find that TVA acted sensibly in response to an ethical problem, it could also find that the Committee impermissibly deferred to Dahlman, whose prejudice influenced the Committee's decision. Because we leave weighing of evidence and credibility determinations to the jury, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

---

**DISSENT**

---

NALBANDIAN, Circuit Judge, dissenting.  I agree with the majority that Bledsoe's claims make it to the pretext inquiry—the third and final step of the *McDonnell Douglas* heuristic.  At this final juncture, the majority deploys a cat's paw theory to decide the case in Bledsoe's favor.  As the majority sees it, Dahlman used all three of his colleagues on the Committee as his "cat's paw" to secure Bledsoe's demotion.  But I do not think the cat's paw theory works on these facts, and so I respectfully dissent.

For the cat's paw theory to work, the unbiased decisionmakers must "*unthinkingly* adopt" the recommendations of their biased colleague.  *Marshall v. Rawlings Co.*, 854 F.3d 368, 378 (6th Cir. 2017) (emphasis added).  Put another way, the point of cat's paw liability is to prevent employers from hiding behind "willful blindness."  *Id.* (quoting *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 486 (10th Cir. 2006)).  We have also called this the "rubber-stamp" theory.[1]  *Bose v. Bea*, 947 F.3d 983, 991 (6th Cir. 2020) (quoting *Bishop v. Ohio Dep't of Rehab. & Corr.*, 529 F. App'x 685, 696 (6th Cir. 2013)); *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008).  When the case involves more than one decisionmaker (e.g., a committee), it stands to reason that the plaintiff faces a taller task.  After all, we need facts showing that the biased supervisor manipulated not just one decisionmaker, but a committee full of them.[2]  Importantly, the four-member Committee here voted unanimously to

---

[1]This might be the better label here.  The Aesop reference doesn't quite work in this scenario.  That's because this case involves one decisionmaker influencing (allegedly) other decisionmakers.  The typical cat's paw analysis involves "a biased subordinate, who lacks decisionmaking power" puppeteering a single decisionmaker. *Marshall*, 854 F.3d at 377 (internal quotation omitted).  Since he is a decisionmaker himself, Dahlman put his paws into the fire along with those of his colleagues, so to speak.

[2]As the majority points out, it's not unheard of (although rare) for courts to apply the cat's paw theory (or some variant thereof) to multiple decisionmakers.  But again, the bar is very high.  In *Gutzwiller v. Fenik*, for example, a tenure committee voted unanimously to deny tenure to a female professor, and we sided with the professor on appeal.  860 F.2d 1317, 1322, 1327 (6th Cir. 1988).  Importantly, most of the tenure committee members in that case "relied exclusively upon the opinion of [the chairman]" because they "lacked the expertise to properly judge [the plaintiff's] work" "by their own admission." *Id.* at 1327.  In fact, most of them "had not even read any significant part of [the plaintiff's] publications." *Id.*  In *DeNoma v. Hamilton County Court of Common Pleas*, we again sided with the employee.  626 F. App'x 101, 106-08 (6th Cir. 2015).  But there, the biased supervisor "was the superior, rather than subordinate, of the interview committee members he allegedly used as a

demote Bledsoe. And had it failed to reach a unanimous decision, the issue would have been elevated to the next-level committee on the TVA hierarchy.

So did the Committee here roll over and hand the keys to Dahlman (as caselaw requires)? The facts say otherwise, which means Bledsoe's claims fall short in the end. I focus on two of Dahlman's colleagues on the Committee in particular: David Williams and Kevin Michael.[3] A reasonable jury cannot conclude that Williams and Michael were conduits of Dahlman's biases, for several reasons.

For one thing, the Committee deliberated over this for *several weeks*. (R. 30-5, Williams Dep., PageID 497 ("[I]t lasted a few weeks that we discussed outside the meeting and in the meetings."); R. 30-16, Michael Dep., PageID 697 ("[W]e talked about this for a long time.").) In fact, as Williams confirmed, "there was never a clear consensus or uniformity of opinion when it came to whether Mr. Bledsoe should be disqualified from working at the training center while Hudson was going to be an NSGPO student." (R. 30-5, Williams Dep., PageID 497.) Rather than "unthinkingly adopt" Dahlman's recommendations, the Committee thought about this quite a bit—that much is clear enough. *Marshall*, 854 F.3d at 378.

Furthermore, Williams is Bledsoe's union representative. It's ambitious to suggest the vice president of Bledsoe's own union would blindingly defer to Dahlman's recommendations. In fact, Williams was well aware of Dahlman's reputation in the workplace as an "intimidating" "bully." (R. 30-5, Williams Dep., PageID 513.) Williams kept himself apprised of Bledsoe's complaints about Dahlman, and he knew Bledsoe "was afraid that Mr. Dahlman would physically hit him." (R. 30-5, Williams Dep., PageID 519.) On top of this, he kept track of several other employees who had complained about Dahlman as well. Indeed, rather than defer

---

conduit for his bias." *Id.* at 105. Surely, this optimized the supervisor's ability to press his thumb on the committee's determination. *Reeves v. Sanderson Plumbing Products, Inc.* is similar. 530 U.S. 133 (2000). The biased supervisor in that case was married to the company's president and "exercised absolute power within the company." *Id.* at 152 (internal quotation omitted). And he "berated" the other decisionmakers "who were supposedly his coequals." *Id.* So the common theme is this: The decisionmakers choose to put their collective heads in the sand (because of power differentials, lack of expertise, or some other reason) and "rely[] on [the] discriminatory information flow" supplied by the biased supervisor. *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 678 (6th Cir. 2008). As the rest of this dissent explains, that is just not what happened here.

[3]As for Megan Markum, I agree with the majority that she likely deferred to Dahlman. *See* Maj. Op. at 14-15.

to the recommendations of someone he knew was bullying his union members, Williams pushed back during Committee deliberations. More specifically, he tried to get Bledsoe transferred to the NLOR course in lieu of a demotion. (R. 30-5, Williams Dep., PageID 497 ("I always said why couldn't he teach requal[ification].").)

That brings us to Kevin Michael. Michael is the one who raised the conflicts issue in the first place. He did this by asking Markum to seek an ethics opinion regarding the potential conflict. In other words, this whole saga began with Michael, not Dahlman. It's odd to think that Michael would raise the issue and then find himself catpawed by Dahlman after the fact. The majority responds by arguing that "[e]ven if the ethics inquiry began with Michael, it is entirely believable . . . that Dahlman would jump at the opportunity to press for a convenient solution to his problems with Bledsoe." Maj. Op. at 17 (internal quotation omitted). That's certainly a plausible account of *Dahlman*'s motivations, but it says nothing about *Michael*. Of course, no one disputes Dahlman's animus towards Bledsoe.

The majority further suggests that because Michael "was never an instructor or manager in the Sequoyah Training Center program," he lacked the qualifications to assess the conflicts issue. Maj. Op. at 15. As the majority sees it, this indicates Michael punted everything to Dahlman. But it turns out Michael had plenty of "firsthand knowledge of . . . the instructors' day-to-day activities." (R. 30-16, Michael Dep., PageID 694.) During the relevant period, he served as the Sequoyah plant's operations superintendent. This meant he was "the primary point of contact for labor-related issues." (*Id.* at PageID 683.) And indeed, Michael was familiar with the goings-on at the training program thanks to both his "time spent [there] as a student" and his "time as a manager . . . being over there involved in classes," "seeing lots of classes go through." (*Id.* at PageID 695.) Besides, he was knowledgeable enough to spot the conflicts issue in the first place.

The majority cites some additional facts: that Michael knew Dahlman was unhappy with Bledsoe's performance, Michael made at least one inconsistent statement, and Michael referred Bledsoe to his supervisor when the latter mentioned the conflicts issue in the hallway. Maj. Op. at 15-16. But none of these could lead a reasonable factfinder to conclude that the kind of catpawing that the caselaw envisages happened here. A reasonable jury would need to find that

Michael abdicated his decision-making authority in toto, opting instead to hide behind "willful blindness." *Marshall*, 854 F.3d at 378 (internal quotation omitted). This, after Michael raised the conflicts issue and engaged in a weeks-long deliberation with the rest of the Committee. At bottom, the record here lacks the *there there* to bridge this gap. Our task is to view the *available* facts in the light most favorable to Bledsoe, not to entertain every possible hypothetical in an effort to go where the record doesn't.

This all begs the question: Why did the Committee vote unanimously to demote Bledsoe in the end? After deliberating for several weeks, the Committee realized the transfer option was untenable for entirely nondiscriminatory reasons. Michael summarized it thus: "We considered assigning Mr. Bledsoe to work in NLOR, but NLOR and NSGPO commingle, meaning that there would not be enough separation between Mr. Bledsoe and his son to prevent the appearance of a conflict." (R. 30-16, Michael Dep., PageID 694.)

The facts support the Committee's conclusion—or at the very least an "honest belief" that the two courses were too intertwined.**[4]** *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) ("When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." (internal quotation omitted)). As Williams emphasized, "[m]ost of the management side was saying they couldn't separate the two [NLOR and NSGPO]." (R. 30-5, Williams Dep., PageID 496.) The management also "claimed they were going to use some of the NLO requal instructors to teach some classes in the NSGPO program." (*Id.*) Michael, for his part, testified that he "expected [instructors that he himself had selected] to communicate with one another, to discuss exam questions with one another, to freely go in and observe other classes, teach other classes." (R. 30-16, Michael Dep., PageID 695.) And he "fully expected that when [he] provided those members of [his] staff to the training staff that they would go into those two programs [NLOR and NSGPO] and perform functions in either

---

**[4]**True, a cat's paw theory *can* defeat the honest-belief rule. After all, once it's established that a decisionmaker relies on the recommendations of a biased supervisor, "the honesty or sincerity of the decisionmaker's belief is irrelevant," and "[w]hat is relevant is that the belief is rooted in a biased recommendation." *Marshall*, 854 F.3d at 380. But all of this presupposes that the cat's paw theory is sound—that the decisionmakers *did* blindly defer to the biased supervisor as a threshold matter. But that's not what happened here, so it stands to reason that the honest-belief rule continues to apply.

program." (*Id.*) Indeed, "[i]t was uninhibited in those two programs how they would work together." (*Id.*) Michael "ha[d] seen instructors go back and forth," and he knew all this "from past experience." (*Id.*)

Of key importance is the Committee's treatment of a similarly situated employee named Roger Brown. The Committee thought about hiring Brown as an NSGPO instructor. But because his son was going to participate in the NSGPO course, Brown ran up against precisely the same conflicts issue that confronted Bledsoe. The Committee concluded, just as it did with Bledsoe, that Brown couldn't teach either course (NLOR or NSGPO). Brown, of course, had nothing to do with Dahlman's prejudices. Nevertheless, the Committee treated him the same way it treated Bledsoe anyway. This confirms that the Committee's decision to demote Bledsoe was driven by nondiscriminatory reasons.[5] The majority says Brown "was not similarly situated because he had merely expressed interest in the . . . instructor position but was never an instructor." Maj. Op. at 21. But it's not at all clear why that distinction should carry the day. Clearly, as its treatment of Brown shows, TVA had honest concerns about the overlaps between the NLOR and NSGPO courses, quite apart from Dahlman's prejudices.

The Committee also considered moving Bledsoe's son to the Watts Bar plant instead. Indeed, Williams testified that he and Michael supported this idea at first. But there were honest reasons to sidestep this alternative as well. For one thing, the list of students had already been set by that point, and "once each side picks a list [TVA does not usually] swap people out," albeit admittedly not always without exceptions. (R. 30-5, Williams Dep., PageID 498-99; *see id.* at PageID 488 ("Once we made selections, there really wasn't no moving people around.").) More significantly, not only did Bledsoe's son rank Sequoyah as his first choice on his preference form, his union had referred him specifically for Sequoyah as well.

---

[5]Bledsoe fixates on two other employees: Darrell Johnson and Bernie Geier. Both were allowed to keep their instructor positions even though each had a son in a training program. But their situations were altogether different. Unlike with Brown and Bledsoe, the father-son relationship here straddled the non-licensed and licensed divide. Johnson taught the NLOR course for the non-licensed operator program; his son participated in the ILT course for the licensed operator program. Geier taught the ILT course for the licensed operator program; his son participated in the NSGPO course for the non-licensed operator training program. True, instructors for the non-licensed and licensed programs could access each other's exam banks. But that does not mean that the two programs (non-licensed and licensed) were as intertwined as the two non-licensed courses. Indeed, Michael and Williams both had honestly held concerns specific to the latter that went beyond shared exam banks. *See supra* at 28-29.

All in all, the evidence is insufficient to show that Dahlman manipulated all three of his colleagues on the Committee.  Indeed, the Committee had honestly held, nondiscriminatory reasons to choose demotion over other options.  Repugnant as Dahlman's comments were, he did not speak for the Committee.  In the end, even Bledsoe's own union representative signed off on his demotion.  This case merits an affirm in my view, and I respectfully dissent.